STRAUS *et al.*, *Appellants*, v. THE IMPERIAL FIRE INSURANCE COMPANY.

1.  Contract: CONSTRUCTION: INSURANCE. A contract of insurance must be construed as a whole, and the sense of a clause which stands with others may be gathered from those which immediately precede and follow it.

2.  —— : —— : —— : CONDITIONS IN POLICY : NOTORIOUS RESISTANCE TO LAWFUL AUTHORITY. A clause in a fire insurance policy which exempts the company from liability for "any loss or damage by fire which shall happen or arise * * * by any person or persons engaged in any riot, or in notorious resistance to the authority of magistrates, or to any other lawful authority," which is preceded by other clauses relieving the company from payment of loss when the fire shall happen by any invasion, foreign enemy, insurrection, civil commotion, lawful military power or usurped power, does not free the company from liability for damage by a fire caused by four or five convicts who secretly combined to free themselves from prison restraint, and who yielded submission immediately upon coming in contact with an officer of the prison authorized to arrest them, although exaggerated reports were circulated outside of the prison, and a company of citizens and others was caused to be armed.

3.  —— : —— : —— : —— : ——. The notorious resistance to lawful authority mentioned in the policy, when construed in connection with the preceding clauses, refers to an extraordinary state of affairs, in which the usually constituted authorities are overpowered and unable to contend successfully with the existing emergency, and not to the acts of a few persons from the results of which notoriety follows, and who readily yield to authority.

*Appeal from St. Louis Court of Appeals.*

REVERSED AND REMANDED.

*Charles Nagel* and *Henry Hitchcock* for appellants.

(1) Defendant was not injured by the court's instruction on the subject of "notorious resistance," etc.,

because there was no evidence to sustain that branch of the defence. *Cluff v. Ins. Co.*, 13 Allen, 308 ; *Harper's Adm'r v. Ins. Co.*, 19 Mo. 506. (2) But all doubt that may have existed, as to the possible meaning of the testimony, has been removed by the finding of the jury under a proper instruction. The court's instruction is sustained : (*a*) By the plain language of the condition upon which defendant relies. *Drinkwater v. Assurance Co.*, 2 Wils. 363 ; *Langdale v. Mason*, 2 Wash. Ins. 791 ; *Harper's Adm'r v. Ins. Co.*, 19 Mo. 506 ; *Cluff v. Ins. Co.*, 13 Allen, 308 ; *Ins. Co. v. Corlies*, 21 Wend. (*b*) By interpreting this condition in the light of others in connection with which it is used. *Harper's Adm'r v. Ins. Co.*, 19 Mo. 506 ; *Cluff v. Ins. Co.*, 13 Allen, 308 ; *Nesbit v. Lushington*, 4 T. R. 783 ; Jones on Construction of Contracts, 300. (*c*) Again, the condition is the language of the defendant, and must, if at all doubtful, be interpreted against it. *Spruill v. Ins. Co.*, Jones [N. C.] Law, 126 ; Jones on Construction of Contracts, secs. 227–9 ; *Blackett v. Ins. Co.*, 2 Cromp. and Jer. 244 ; *Yeaton v. Fry*, 5 Cranch, 335 ; May on Ins., secs. 175–6 ; *Palmer v. Ins. Co.*, 1 Story C. C. 360 ; *Welts v. Ins. Co.*, 48 N. Y. 39. And this is particularly true when the condition appears in the printed portion of the policy. May on Ins., sec. 177. (*d*) And generally the entire policy should be interpreted so as to further, as far as possible, its original purpose, insurance. May on Insurance, secs. 174–179 ; *Brown v. Ins. Co.*, 45 Mo. 221 ; *Stout v. Ins. Co.*, 15 Rep. 577 ; *Westfall v. Ins. Co.*, 2 Duer, 495 ; *Barton v. Ins. Co.*, 42 Mo. 156 ; *Yeaton v. Fry*, 5 Cranch, 342.

*Henry T. Kent* for respondent.

The error complained of in this case lies within the instruction of the court, which declares to the jury the meaning of "notorious resistance to lawful authority." The respondent contends, and the court of appeals so

decided, that it being part of the contract, it must receive a reasonable interpretation consonant with the apparent object and plain intent of the parties, and that the construction of the circuit judge was unreasonable, and inconsistent with the terms of the policy and the circumstances and facts of the case. *Webb v. Ins. Co.*, 14 Mo. 8; *Barton v. Ins. Co.*, 42 Mo. 156; *Ins. Co. v. Boon*, 95 U. S. 117.

BLACK, J.—The policy of insurance upon which this action was based covered certain personal property and machinery located in the state penitentiary at Jefferson City. The property was destroyed by fire on the twenty-third of February, 1883. The plaintiffs, Straus & Company, recovered a judgment in the circuit court, which was reversed by the court of appeals, and they appealed to this court.

The defences to the action are based upon the following stipulations in the policy : "Provided, always, and it is hereby declared and agreed, that these respective companies shall not be liable to make good any loss or damage by fire, which shall happen or arise *  * * by any person or persons engaged or concerned in any riot, or in notorious resistance to the authority of magistrates, or to any other lawful authority."

While the evidence is voluminous, there is little or no conflict in it, and the facts are these : The penitentiary buildings, of which there are a number, are surrounded by a high stone wall. The penitentiary was operated on the contract system, and the plaintiffs used one of the buildings for manufacturing purposes by the employment of hired prison labor. About ninety-five men were employed in the second story in manufacturing harness. The first story was used as a collar factory, and was divided into two rooms, some sixty-five men were employed in the front room, and twenty-six in the rear one, which was called the "stuffing-room."

The state furnished a guard, or time-keeper, for each of these rooms, whose duty it was to keep the time of the men, to keep order, and report to the deputy warden all violations of the prison rules; but they were not permitted to carry arms. The contractors furnished a foreman for each room. At the time of the fire there were fourteen hundred convicts in the prison.

Between twelve and one o'clock, on the twenty-third of February, 1883, the convicts returned from the dining-hall to the shops under the direction of their guards. It was the duty of the convicts to take their respective places at the work-benches, but they could work or not as they preferred until one o'clock. Mr. Tarlton, the guard for the second floor of the building used by the plaintiffs, remained on the upper floor platform of the outside stairway while the men in his charge passed into the room. Three or four convicts, under the leadership of Johnson, a convict, unobserved by Tarlton, with knives used at the benches in their hands, went down the inside stairway to the first floor. Johnson stepped up to Van Horn, guard in the front lower room, and Snyder, foreman in the same room, who were then talking together, and commanded them to keep quiet, saying to Snyder that he would kill him if he moved, and to both of them that if they kept quiet they would not be hurt. Johnson left the guard and foreman in charge of his associates, and went to the other room, apparently for the purpose of getting assistant foreman Schinberg, who escaped crying "murder." Johnson then came back and demanded of Snyder his clothes, threatening to kill him if he did not give them up, and at the same time cut his apron string. Snyder yielded up his pants, vest, and hat, and Johnson put them on over his prison garb, took a coat from another guard by the name of Platt, and went into the yard. There he procured a ladder and went to the enclosure wall, and was attempting to place the ladder against the wall, when the guard on

the wall accosted him, and Johnson said, "there was a riot in the yard and that he had been sent to hold that post."

Baffled in this effort by the threat of the guard to shoot him, Johnson went back to the collar-room, cursing and calling upon the convicts to follow him. He then passed into the "stuffing-room" and in the presence of the guard, foreman, and convicts, struck a match and set fire to a quantity of straw. At the alarm of fire, the engineer attached two lines of hose to the fire plug and was proceeding with one line of hose when Johnson struck him, and at the same time Johnson and his three or four associates, with their knives, cut the hose so as to render them useless. Johnson then gave up to Snyder the latter's clothes, and with knife and club in hand went to Sullivan's factory and endeavored to raise a mutiny, but failed in his efforts. Deputy Warden Bradbury, at this time, with his pistol in hand, arrested Johnson, and put him and his three or four associates in confinement. The disturbance, up to the time of the fire, lasted not more than fifteen or twenty minutes, and during that time the convicts, save Johnson and his three or four associates, were under the control of, and obeyed every order of, their unarmed guards. While the fire was in progress many of the convicts, detailed by the deputy warden, took an energetic and faithful part in saving property.

Outside of the prison walls, exaggerated reports were circulated, and the Adjutant General caused a company, composed of citizens and legislators, to be armed. But Deputy Warden Bradbury, who was within the prison walls, during the entire time, says he had no notice of this outside organization, did not request or need it, and at no time did a convict refuse to obey his orders.

No complaint is made of the rulings of the court in respect of the riot clause; but defendant complains of

the instruction given by the court, of its own motion, on the other branch of the defence. The material parts of that instruction are as follows:

"The court further instructs you, that the phrase, 'notorious resistance to lawful authority,' as used in this instruction and in the policy of insurance, means (as applied to the circumstances of the present case) a resistance of such magnitude and accompanied with such show of force as operated for the time being to disrupt prison discipline and free the inmates of said penitentiary, or large numbers of them, from the restraints of law and from the restraints of prison regulations. It does not mean a resistance to authority, on the part of one person or a few persons, that was readily and speedily overcome by the prison officials, without losing their control over the great majority of the inmates of said prison."

It must be conceded that this instruction, in the light of the evidence, amounted, practically, to a direction to the jury to find for the plaintiffs on the clause of the policy therein defined. The real question in the case is, whether the evidence tends to establish a defence based on that clause. We are not aware of, and counsel, with their uniform diligence, have been unable to discover, any case in which a clause has been construed and applied which exempts the insurers from loss "by fire which shall happen or arise by any person or persons in notorious resistance to the authority of magistrates or to any other lawful authority." This clause is a part of the printed portion of the policy, and it is clear it was not specially designed for this particular policy, but for general use, and it is in this light we must understand and treat it.

The term, "magistrates," is evidently used in the general sense of a public civil officer. When these four or five convicts went to the lower room, and there, by their actions and threats, put the guard or time-keeper

and foreman in their power, they were in resistance to lawful authority of the prison, and, it may be conceded, to "lawful authority," within the meaning of the policy. But this is not enough to relieve the insurers. The fire must happen by a person or persons in notorious resistance to the constituted authorities. It cannot be that the notoriety indicated means that which arises and flows from the results alone of the incendiary act. Should a person resist the efforts of an officer to arrest him, and in doing so set fire to a building, and thereby destroy the same and one or more human beings, and the whole affair, by reason of the enormity of the consequences, becomes a matter well known, it could not be fairly said that the insurers, under such a clause, would be relieved from the payment of the loss. Such a construction would make the notoriety which follows as an incident the criterion, whereas the policy clearly means that there is existing and going on a notorious resistance to the authorities. The evidence of the organization of a company of men on the outside of the walls of the prison, as a prudential measure, is, therefore, of little or no consequence.

But it is urged that the instruction is faulty in this, that it requires the resistance to be of too great a magnitude in point of seriousness and the number of persons engaged in it. Webster defines notorious as, "generally known and talked of by the public; universally believed to be true; manifest to the world," etc. Thus we speak of one as a notorious thief. The word has a defined signification in describing that adverse possession upon which one may found a claim to land. The possession must be open, or visible, and notorious. As said in *Armstrong v. Morrill*, 14 Wall. 145, "secret possession will not do, as publicity and notoriety are necessary as evidence of notice and to put those claiming an adverse interest upon inquiry." In these and like cases the idea of a number of persons engaged in the act is wanting, it is true. But

this contract must be construed as a whole ; as said in *Barton v. Ins. Co.*, 42 Mo. 158 : "With respect to the rules of construction in policies of insurance, except in cases relating to warranties, it is the duty of the court to adopt the construction that in their judgment shall best correspond with the real intention of the parties." Again, when a clause stands with others its sense may be gathered from those which immediately precede and follow it. *Harper v. Ins. Co.*, 19 Mo. 506.

The clause here in question is preceded by others which relieve the company from payment of the loss when the fire shall happen by any invasion, foreign enemy, insurrection, or civil commotion, lawful military power, usurped power, or by any person or persons engaged in a riot. The class notion prevailing in these cases is, that there is an unusual and extraordinary state of affairs, a state of affairs in which and for the time being the usually constituted civil authorities are overpowered and inadequate to successfully contend with the existing emergency. All this is true in respect of the clause, "notorious resistance to lawful authority." It was never in the mind or contemplation of the insured or insurers that the company should be relieved from payment of the loss, when the fire should happen during those occasions of resistance to the authorities which usually well-regulated governments are at all times prepared to overcome, even though well or publicly known. Had such been intended, different language would have been used. Such a construction would make the most trivial disobedience to the commands of an officer, if seen or heard by a multitude of people, a case of notorious resistance. The expression must be understood in a more general sense—the sense before stated.

Now, in this case, the sum and substance of the evidence is, that these three, four, or five convicts secretly combined, it would seem, to free themselves from prison restraint. They put two unarmed guards and as many

foremen in practical arrest. These guards or time-keepers had no authority to make arrests or to inflict a punishment for disobedience of the prison rules, but were required to report to their superior. The other prisoners were at all times obedient. The moment these refractory convicts came in contact with an officer authorized to arrest, they yielded immediate submission. The prison power was adequate to overcome such a resistance, and it was nothing more than a state of affairs which ought to be prepared for at any and all times. Our conclusion is, that the evidence does not tend to make out a case within the condition of the policy in question, and the court might well have so directed the jury. That being so, the judgment of the circuit court ought to be affirmed.

The judgment of the court of appeals is, therefore, reversed and the cause remanded to that court, with directions to it to affirm the judgment of the circuit court. Sherwood, J., absent. The other judges concur.