LESLIE C. WATSON v. JULIA RICHARDSON *et al.,* Appellees and GEORGE NILES WATSON, Appellant.

**Recognition of Bastard:** BURDEN OF PROOF. Under Code, section 3385, providing that illegitimate children may inherit from the father when they have been recognized by him as his children, "but such recognition must have been general and notorious, or else in writing," the burden of proof to establish the paternity and recognition required rests upon the child claiming the right to inherit.

SUFFICIENCY OF EVIDENCE. Where an illegitimate son claims the right to inherit from his father, who died a bachelor, and the vital issue was whether the claimant had been recognized by his father "in writing," as required by Code, section 3385, it appeared that his foster parents removed with him from the place of his birth to another state when he was about three years old, and he did not return until after the death of the putative father, about twenty-three years later. As appeared from a letter written by him shortly before his return, he had "never had an idea who his parents were;" and there was much inconsistency in the evidence relating to his parentage. His foster father testified that, at the time of his adoption, when he was about three months old, the decedent, at the request of the witness, signed a contract with the foster mother acknowledging the paternity of the child and agreeing to pay for his support; that he had never read the contract, though it was kept with his wife's papers; that it was read by her to the boy, when he was about seventeen years of age, about two years before her death; that she had received letters from the decedent with money to pay for the boy's support; that a servant had told witness that his wife, while in a fit of delirium, shortly before her death, had burned all the papers. The servant was not called to testify. Another witness testified that the decedent had written two letters to him, referring to the boy as his child, which letters were also destroyed. Another witness testified to mailing a letter duly stamped and correctly addressed to the boy by decedent, but it was not produced, and no excuse

was shown therefor. Another witness testified that, while visiting at the house of the boy's foster parents, his foster mother sought a private interview with the witness, in which she showed him the contract and several of the letters in question. Another witness testified that decedent had read to him a duplicate of the contract and that he noticed it was in decedent's handwriting and was signed by him. No such paper was found in his papers and it was not shown to have been taken therefrom after his death. There was evidence showing that decedent made a will, about four years before his death, leaving all his property to his nieces and nephews, which he afterwards destroyed. *Held*, that the evidence was insufficient to establish such recognition "in writing" as would entitle the claimant to inherit from his father.

GRANGER and GIVEN, J. J., dissenting.

SCRUTINY OF TESTIMONY. Where an illegitimate child claims the right to inherit from his father, under Code, section 3385, giving such children that right when they have been recognized by the father 4 as his children, and such recognition has been "general or notorious," though declarations of the putative father are competent to show such recognition, such evidence must be carefully scrutinized.

"GENERAL AND NOTORIOUS." Evidence showing that a putative father recognized an illegitimate child as his own in the home of its foster parents, during the first years of its life, and occa- 7 sionally thereafter, after their removal to another state, is not sufficient to establish such "general and notorious" recognition by the father as will entitle the child to inherit, as provided by Code, section 3385.

CURRENT RUMORS. Evidence of current rumors or reports, where a putative father lived at the time of the birth of an illigitimate child, to the effect that such child belonged to him, or subse- 6 quently, that he had such child, is inadmissible to show the paternity of such child, when he seeks to establish heirship, under Code, section 3385, providing that an illegitimate child may inherit from the father when he has been recognized by him as his child.

Mailing Letter: PRESUMPTIONS. In the absence of proof to the contrary, it will be presumed that a letter, duly stamped, cor- 2 rectly addressed, and mailed on a train by being handed to a United States mail agent, reached its destination.

SECONDARY EVIDENCE. Where a letter, correctly addressed and duly stamped, is shown to have been mailed to a party, he cannot 3 prove its contents by secondary evidence, without showing its loss or destruction.

SAME. Parol evidence as to the contents of a written contract is admissible where it is shown that it cannot be found among the 3 papers of the person entitled to its possession.

*Appeal from Jackson District Court.*—HON. C. M. WATER-
MAN, Judge.

SATURDAY, OCTOBER 14, 1899.

ON the twenty-sixth day of August, 1895, Mott Watson
died intestate, seised of certain lands in Jackson county,
Iowa; and the plaintiff, a nephew, began this action in
partition December 9, 1895, making Julia Richardson, a
sister, and the heirs of three brothers, two sisters, and one
half-brother, parties defendant. An amendment to the peti-
tion alleged that George D. Niles claimed some interest in
the land, and asked that he be required to set up whatever
interest he might have. Niles, styling himself George Niles
Watson, filed an answer and cross petition, in which he
admitted the death of Watson, and the relationship of the
parties to the suit as stated, but averred that he was the
illegitimate son of said Watson, and as such had been recog-
nized by him in a written contract with one Mrs. Niles for
his support, made in duplicate, and executed in March, 1870,
and also that he had been so recognized generally and notor-
iously. In an amendment Niles alleged that Watson so rec-
ognized him in a letter written to claimant about August 1,
1895. These allegations were put in issue by appropriate
pleadings of the plaintiff and the other defendants. Decree
was entered dismissing the cross petition of Niles, and order-
ing the partition of the lands as prayed. George D. Niles
appeals.—*Affirmed.*

*Murray & Farr, G. L. Johnson, Hayes & Schuyler, Levi
Keck, D. A. Wynkoop,* and *A. L. Bartholomew (Hubbard
Dawley & Wheeler* and *Rothrock & Grimm,* of counsel) for
appellant.

*L. A. Ellis, J. R. Lane, B. F. Thomas, F. D. Kelsey,*
and *W. J. Rogers* for appellees

LADD, J.—Mott Watson died August 26, 1895, intes-
tate, at the age of sixty-seven years, leaving property esti-

mated to be worth two hundred and seventy thousand dollars. He had never been married. His estate is claimed, on the one hand, by a sister, and the children and a grandchild of deceased brothers and sisters, and, on the other, by George D. Niles, styling himself George Niles Watson, as the natural son of the deceased. At the common law a child born out of wedlock could not inherit, as he was the son of nobody, the blood of no ancestor coursed in his veins, and property by descent was transmitted only through the issue of his own body. *Norman v. Heist,* 5 Watts & S. 171; *Cooley v. Dewey,* 4 Pick. 93; *McDonald v. Railway Co.,* 144 Ind. 459, 55 Am. St. 185 (43 N. E. Rep. 447) 1 Blackstone Commentaries, 569; *Van Horn v. Van Horn,* 107 Iowa, 247. The civil law was more indulgent, as the illegitimate might inherit from the mother, and succeed to the inheritance of the father in event the parents married; and, if the father left no wife or lawful issue, he took one-twelfth of his estate. The greater leniency of the civil law has triumphed, through our statutes, over the harsher restrictions of the common law, apparently favoring matrimony; and now illegitimate children become legitimate by the marriage of their parents (Code, section 3150), inherit from the mother, and she from them (Code, section 3384), and "inherit from the father when the paternity is proven during his life, or they have been recognized by him as his children; but such recognition must have been general and notorious, or else in writing. Under such circumstances, if the recognition has been mutual, the father may inherit from his illegitimate children." Code, section 3385. The written recognition contemplated by the statute need not be formal, nor for that express purpose. *Crane v. Crane,* 31 Iowa, 296. See contra, *Pina v. Peck,* 31 Cal. 359. It is sufficient if the writing, whether letter, contract, or other instrument, clearly acknowledges the parentage of the putative father. *Brown v. Legion of Honor,* 107 Iowa, 439. As the law indulges the presumption of innocence in all cases, the bur-

den of proof necessarily rests on the claimant to establish
(1) that he is the son of Mott Watson, deceased; (2) that
during life he was recognized by him in writing as such;
or (3) that Watson so did generally and notoriously.

II.   Before considering the case on its merits, some
preliminary questions should be disposed of.  The appellees
insist that proof of the contents of an alleged letter and con-
tract, upon which recognition is predicated, must be excluded
because of the failure to lay the proper foundation
for the introduction of secondary evidence.  If
the letter was written by Watson shortly before
his death, and placed in an envelope, duly stamped,
and addressed to George D. Niles at San Antonio,
Tex., his then place of residence, as related by Mrs.
Wright, and by her mailed on the train by being
handed to a United States mail agent, in the absence of any
showing to the contrary it will be presumed to have reached
its destination.  This is because of the probability that the
officers of the government have performed their duty. *Penny-
packer v. Insurance Co.,* 80 Iowa, 56; *Cushman v. Hassler,*
82 Iowa, 295, 13 Am. & Eng. Enc. Law, 261.  As
the claimant is presumed to have received the letter,
and no showing of its loss or destruction has been
made, evidence of its contents was not admissible.   The
claimant bases his action, in part, on an alleged written
agreement for his maintenance made by Watson with Mrs.
Niles.   Even if this was in duplicate, that of Mrs. Niles
belonged to her, and not to her adopted son, and might well
be sought among the papers left by her at her decease in
1888.   However much it may have concerned the claimant,
he had no right to its possession.   Niles testified that, after
diligent search where his wife's papers were usually kept,
he was unable to find it.   No such contract was found among
the papers of Watson.  We think this showing quite sufficient
to warrant the introduction of secondary evidence of its
contents.

III.   In the very nature of things, the issues must be determined largely upon the evidence introduced by the claimant.   The collateral heirs can be expected to do little else than insist upon due proof of what he avers.   Much of the testimony is not subject to direct contradiction.   For example, that of a witness alone with Watson to the effect that he referred to the claimant as his son.   Such declarations of the putative father concerning the parentage of an illegitimate child are admissible.   *Niles v. Sprague,* 13 Iowa, 207; *Tyler v. Flanders,* 57 N. H. 618; *Barnum v. Barnum,* 42 Md. 252; *Crouch v. Hooper,* 16 Beav. 182; *Webb v. Haycock,* 19 Beav. 342.   But these cannot, in the nature of things be controverted, and for this reason must be carefully scrutinized, and received, if at all, with caution.   As said in *Crouch v. Hooper, supra:* "It is also always necessary to remember that in these cases, from the nature of the evidence given, it is not subject to any worldly sanction; it being obviously impossible that any witness should be convicted of perjury for speaking of what he remembers to have been said in a conversation with a deceased person."   See *Laurence v. Laurence,* 164 Ill. Sup. 367 (45 N. E. Rep. 1073); *Markey v. Markey,* 108 Iowa, 373.   Such testimony must necessarily be tested by its own inherent probability or improbability, by comparison with the other evidence in the case, and by the ordinary rules of human conduct under similar circumstances.   The collateral heirs, in affirmative proof, are necessarily limited to that of collateral facts and circumstances, and to matters affecting the credibility of the witnesses whose evidence may tend to establish the claimant's right to inherit.

IV.   That George D. Niles was born at the poor farm in Jackson county, Iowa, in the latter part of December, 1869, and that his mother went by the name of Mary Jones, are put beyond controversy by this record.   In March, 1870, he was adopted by Mrs. Niles, whose husband was then proprietor of the Decker House, at Maquoketa.   Niles and

his wife moved to Nebraska in 1873, and from thence to Abilene, Kan., in 1876. Mrs. Niles died in 1888, and in 1889 the claimant enlisted in the regular army, in which service he continued till the fall of 1895. In 1890 he married, and after about a month separated from his wife.

After leaving Maquoketa in 1873 with Mrs. Niles, he did not return until after the death of Watson. As appears from a letter written by him September 15, 1895, he "never had an idea who his own parents were, and never gave the matter much thought." The suggestion that he was the son of Mott Watson, made by Cravens, to which this was an answer, evidently came to him as a surprise, though he did not hesitate to seize the opportunity of becoming the heir of a fortune.

V.  Whether Mary Jones was employed at the Decker House in 1868 and 1869 is left in doubt by the evidence; the testimony of nine witnesses tending to show that she was, and that of eight that she was not. In the view we take of the case, it will be unnecessary to determine that controversy. Again, there is much inconsistency in the evidence relating to the parentage of the claimant. That Mary Jones was his mother cannot be doubted, but who was his father? If the witnesses of the appellant are to be believed, Watson, a man of wealth, permitted the victim of his lust to be taken by his own door, illy clad and destitute of means, to the poor farm, to give birth to his child, to which he soon thereafter became devotedly attached. Sensitive to criticism and anxious to put a quietus on the scandal, he yet garrulously and almost boastfully talked to the employes of the kitchen and of the chamber, and their lovers, of the child he had begotten, and its mother. Concealing the story from his associates in business, he talked freely of his progeny to casual callers at his office and chance acquaintances. Agreeing to pay Mrs. Niles an unlimited sum for the child's support, he permitted the county to bear the expenses incident to its birth. Treating him with affection and contribut-

ing to his comfort when in Maquoketa, he neglected to visit or see him for twenty-two years thereafter, and failed to insist that he receive the education for which he is alleged to have paid. Reticent in speaking of his private affairs, he prattled of his illegitimate son to servant girls, boarders, to a little girl, and to a young boy. While considerate of his reputation, as appears from the testimony of A. M. Smith, Stevenson, and Belden, he was openly lewd, as shown by the evidence of Burns and Eberly. Though he yearned for his son and that he be with him in his old age, he forgot to mention him in his will made in 1890 or 1891, disposing of all his property to others. With these glaring contradictions, can it be said that this is the son of Watson, even though numerous witnesses have testified he so informed them? There is no evidence that Mary Jones ever charged Mott Watson with such paternity. It may be said such evidence was inadmissible. But, in view of the fact that scores of witnesses were called to prove common report, we are warranted in thinking that, had she ever so declared, it would have appeared in this record. She, who would have had every reason to speak, was silent, while Watson, who had every reason to be silent, published his shame. With the strongest reason for doing so, operated upon by no restraint whatever, why did not Mary Jones declare the fact, if Watson was responsible for her condition? He was wealthy, and by so doing she could have secured proper care without the humiliation of procuring it at the public expense, and could have secured the rearing of her child in comfort, rather than in poverty. Many women have testified to familiar conversations with him concerning his relations with Mary and her progeny. Was it natural that this reticent bachelor of forty years should have freely talked on such subjects with women, and that reputable women should have listened, even though he was willing to speak. Yet, twenty-seven witnesses testified to conversations in which he referred directly or indirectly to the claimant as his son, and twelve

others that he spoke of having a boy. In nearly every instance only Watson and the witness were present. To some he spoke in jest, and the evidence of others is of such a character as to leave their veracity in doubt. Others, however, appear to be reliable, and but for the inconsistencies and contradictions pointed out, and the will to which attention has been called, we should extend to them full credit. As it is, we leave this issue undetermined, and make these suggestions only in view of what we shall say hereafter.

VI. We now come to the question of vital importance; i. e. did Watson during his lifetime recognize the claimant as his son, in writing, or if he did so orally was such recognition general and notorious? If in writing, it was when Mrs. Niles adopted the child. That Watson, who was a notary public, with office in the same building, and a boarder at the hotel, of which George Niles was proprietor, prepared the adoption papers which Mrs. Niles and Mary Jones signed, or at least took their acknowledgment thereto, may be conceded. But did he go further, and sign a contract in which he acknowledged himself to be the claimant's father, and agree to remunerate Mrs. Niles for his maintenance and education until of age? Appellant, to establish this, relies mainly on the evidence of three witnesses. Niles testifies that he opposed the adoption until Watson agreed to pay for the child's support and signed an agreement, as above stated; that Watson wanted to pay a stipulated price, which Niles refused, and finally undertook to pay whatever it might cost, on condition that he (Watson) be permitted to retain the adoption papers, in order to be able to retake the child at will. But according to other witnesses, Mrs. Niles wanted these, so that the child could not be taken from her by its mother. As the adoption papers were executed by Mrs. Niles and Mary Jones, it is not perceived what advantage Watson might derive from their possession. Up to that time, Niles had never heard of the child's mother, nor that Watson had a son, though he had already been in the Decker House seven

months. He does not recollect that any copy of the contract. for support was made, and is certain his wife did not sign it. He relates that the contract was placed in an envelope with a copy of the adoption papers, and, though frequently seen, was never read, by him; that the envelope was last seen by him in June, 1888, when he took it while moving in Abilene, Kan., at the request of his wife, afterwards returning it to her, and since her death, in October of that year, he has been unable to find it. Nor has he been able to find any of the numerous letters he testified his wife received from Watson. He claims that Watson paid Mrs. Niles twenty-five dollars just before he left for Nebraska in 1873; that she brought five hundred dollars with her in the fall, which she told him Watson had given her; that Watson sent money often to her up to the time of her death, as she informed him, and as he knew from the handwriting on the envelopes containing bills; and that he sent her a draft of one hundred and seventy-five dollars in 1874, through Cart Weed, since deceased, which was cashed by a postmaster at Arapahoe, Neb., also deceased. The importance of these letters is apparent, and their loss is sought to be explained by saying that he was informed by a servant girl that they, with the papers in question, and some old account books, were burned by his wife, who had been an invalid, several months before her death, and was sometimes out of her head, and that he had found the stubs of the books in the stove. This girl was not called as a witness, and his statement may be regarded as hearsay. While his wife seemed anxious for him to care for the mysterious envelope and letters in moving, this was scarcely accomplished before all were consigned by her to the flames! All gone. So much written by this batchelor of his alleged boy, and yet not a scratch of the pen in existence to confirm the story of his parentage! Not even an envelope! Rains testifies that Watson had written to him concerning the purchase of property, and in two letters fondly mentioned his son, whom, by the way, he had not

taken the trouble to see for more than sixteen years! But these letters were ruthlessly destroyed by vandal hands during Rains' "absence from the South!"

Mrs. Wright was kind enough to mail his letter, correctly addressed to the claimant, referring to him as his son, and calling him to his home after twenty-two years of neglect. But the whereabouts of that letter no man can tell! The contract and all these letters to Mr. Niles are burned in a fit of delirium. But Niles said in his letter, as will be seen, of the papers, "Whatever became of them, I never knew." During all this time the witness, though foster father of this boy, never wrote a letter to Watson, nor received any from him. Though in straitened circumstances always, he never read a letter sent by Watson to his wife, and never discussed the charges to be made for the maintenance of the child. Up to 1887 the boy had been treated as their own child, and at that time the wife according to Niles, read him the alleged contract, and told him of his parentage, and during the year following she had received money several times; but none came thereafter, though the boy was still a minor, and Watson uninformed of his wife's death! How came he to stop writing, and how did it happen that Niles made no further demands for support? The only draft ever sent came from a banker since deceased, and was paid by a postmaster of a little Nebraska village, since dead. The only written evidence remaining are the letters of the claimant and his foster father, Niles, and these have not been destroyed . They stand as unanswerable refutations, if any were needed, to the story told by Niles. On september 16, 1895, the claimant wrote in answer to a letter from D. T. Cravens: "If I have any kind of a good claim, I think you could take up the case and on its merits, and take your commission out of the estate. * * * I think you had better try and find my real mother, and take steps you think best." And on September 15, 1895: "I am not able to give an answer to any one of them [questions] that would do you any

good, for I have so little knowledge of this case. In fact, I
never had an idea who my own parents were, and never gave
the matter much thought. But, of course, now matters have
taken a different light, and I will fight till the last gun." This
statement of the claimant is in flat contradiction of the testi-
mony of Niles that the alleged contract was read to him,
and he informed him of his parentage. Had this been done at
the age of seventeen and the boy been informed for the first
time that his father was a wealthy man of Watson's stand-
ing, he would never have forgotten it. Had Niles talked
with him of being the son of Mott Watson, would the boy
be saying to Cravens in 1895 that he "never had any idea
who his parents were," in answer to a letter relating to his
inheritance? If Watson had been sending money to Mrs.
Niles up to the time of her death, is it not likely he would
have continued so doing until he discovered that event? Can
Niles' failure to write Watson of the marriage and enlist-
ment of this boy be explained, if he knew of the relationship?
These very natural inquiries are all answered by his letters,
written after the death of Watson to Cravens, and stamp his
whole story as a fabrication unworthy of belief, and show
that he had never heard of the alleged relationship of Wat-
son until it was suggested by his correspondent. We set
these out *verbatim et literatim:*

"Abilene, Kansas, September 2, '95.

"D. T. Cravens, Esq., Maquoketa, Iowa.

"Friend Cravens: Yours just received contents noted;
was glad to hear from you; will write to George at once
he is in the regular army will have him write to you; I think
such is the case; he looks like Watson; if you can find his
mother; think she went by the name of Johnes; she was from
near Iron Hill; I think she came to my house with one Mrs.
Stephens. We youst to call her bloomers; Dan Haits will
proaly no wher try to find her if you can I will leave the
case until you hear from him will instruct him to write to
you; if you can find her and such is the case then there will

be no further trouble; let me know how you succeed; my wife has been dead seven years next month; by the way Watson wrote up the papers when she took the boy; some oth-things I could say; but will not mention them now; first of all find the mother; writ me often.    Yours most respt,

                              "Geo. A. Niles."

This evidently was written before he had ascertained recognition in writing must be shown. It was in answer to inquiries concerning the child reared in his family, and whether Watson was his natural father.    He makes response that he does not know,—"See the mother, and she can tell you."    He is inclined to give credit to the suggestion, because the boy looks like Watson, and will believe it "if you can find her [the mother], and such is the case."    Why did he not answer: "George is the son of Watson.    He so said in a written agreement for the support of the child, and for 19 years sent Mrs. Niles money to be used for his maintenance and education?"    *Because it was not true.*    But here is another letter written after he had time for reflection and to refresh his memory:

                    "Abilene, Kansas Sept. 29
"D. T. Cravens Esq
"Maquoketa Iowa
  "Friend Cravens

    "Yours at hand, I have no papers of Mots; not even the papers that were given to my wife when she took the Boy whatever became of them I never knew; She was out of her head a great deal of the time for months; and would give away the last thing in the house. People took advantage and in that way things were scattered even her Purse with keepsakes I never saw after her death; I now this much: Watson drew up the papers: and the mother signed them they were given to my wife as I had objected and wanted nothing to do with it.    I only now of Watson giving her any money but once the balance would be hearsay and not evidence.    I would like to know what the mother has to say:

And if she remembers who drew up the papers and where it was done will write more of the particulars when I hear from you.

    "Yours truly                     Geo. A. Niles."

Even then he does not know "where the papers that were given to" his wife were, though it appears from his testimony the hired girl had informed him his wife had burned them. But he does know "this much: Watson drew up the papers: and the mother signed them." This is the extent of his knowledge at that time, and it may well be asked, when did he discover that Watson signed the agreement? He explains why the adoption papers were made to his wife. Why did he not go further, and say, if true, that Watson's agreement to remunerate her for the expenses of maintenance and education of the child because it belonged to him overcame his opposition to its adoption by his wife? If Watson had paid her money at short intervals during eighteen years, how does it come that he cautiously informs his correspondent, "I only know of Watson giving her any money but once, the balance would be hearsay, not evidence?" It is utterly impossible to harmonize these letters with the testimony he has given, and, as we have seen, much of that, to say the least, is extremely improbable. After a careful examination of his evidence, we have no doubt in concluding that he had no information as to the parentage of the claimant, and that he knew nothing of an agreement by Watson with his wife.

We might stop here, for, if the husband of one of the alleged contracting parties, with whom the claimant lived for twenty years, had no information of the existence of the contract, we might say with reasonable safety that it did not exist. But we shall call attention to the other witnesses referred to.

One Carter testified that he happened, in Abilene, Kan., to look at a section of land; that Mrs. Niles, whom he had known at Maquoketa, told him she wished to see him before he returned, and, being invited to dinner by Niles, she

sought a private interview, in which she showed him the
alleged contract of Watson, and several of his letters (that
the contract was signed by Mrs. Niles, and the letters pur-
ported to inclose amounts ranging from fifty dollars to one
hundred dollars, and asked him to intercede with Watson
for more liberal contributions for the education of the
claimant; that, after some hesitation, he agreed to do so, and
did see Watson on his return. We give only the substance
of that portion of his testimony relating to the contract. It
will be noticed that he is sure Mrs. Niles' name was signed
to this, while Niles is certain it was not. Niles fixes the
amounts inclosed in Watson's letters at not exceeding twenty
dollars each, while the witness fixes these at from fifty dollars
to one hundred dollars. This may be accounted for on the
ground that she was generous enough to permit him to read
the letters, though that privilege had been denied her hus-
band. But there can be no dispute as to what was said and
done at this private interview between himself and Mrs.
Niles, as she is dead and no one else was present! And yet
it is somewhat remarkable that Niles was not permitted to
hear that conversation! No report of the interview with
Watson was made to Mrs. Niles, as it was satisfactory, and
he agreed to remit a sufficient amount for the child's educa-
tion! Twenty citizens of Omaha declared the reputation
of this witness for truth and veracity bad. No inquiry was
made on cross-examination, as is usual, concerning the source
of their information. Two of these had been associated with
him in business, and two employes of his firm or company
as then constituted. Seven were engaged in the same line
of business as Carter (hardware), two others in the tin and
sheet-iron business, and another as retail dealer in stoves.
Two were builders, and the others engaged in work not
closely identified with his occupation. On the other hand,
twenty equally reputable witnesses say his reputation in this
respect was good, though they had never heard it questioned
in that city of a quarter of a million people! Only one of

them was engaged in like business, and three were builders. The others were not employed in a business of a similar character. It is well known that little concerning a man's true character is likely to be understood in a large city, except by those brought in contact with him in the same line of work or trade. The evidence of twenty of Carter's acquaintances, one-half of whom enjoyed exceptional opportunities of knowing him, declaring his reputation bad, must, under the circumstances, be regarded as having overcome that of those who never heard it questioned, though having some acquaintance. All these witnesses, as well as Carter, were before the lower court, which had better opportunities for weighing evidence than are possible here, and we are not inclined to disagree with its conclusions that his testimony is not entitled to credit.

D. P. Smith, with whom Watson boarded while proprietor of the Decker House, for four years after 1872, testified that Watson informed him that year, or the one following, of his son, and read to him a duplicate of a written contract for his support, and that he looked over Watson's shoulder, and noticed it to have been in his handwriting, and by him signed. He undertook to reproduce it substantially in the words written, and discovered in it what Niles and Carter were unable to find,; i. e., the name of the claimant. But no such paper was found among Watson's effects, and we are satisfied it was not abstracted therefrom after his death. This witness declared he had never mentioned this incident until he did so to claimant's attorney, who had previously paid his expenses to come more than one hundred miles to interview him! Three witnesses testified that Smith had stated at his hotel in Aledo, Ill., in the fall of 1895, that Watson had no child; that they were trying to put it on him, because he left lots of money; and that he had never seen any papers, and did not believe any existed. But the moral character and the reputation for truth and veracity of each of these was attacked and sustained by about an equal number of citizens from that

place. The attempt to impeach, however, was not success-ful as to one of them, at least. Eight witnesses also declared against the reputation of Smith for truth and veracity, and an equal number sustained it. His story has earmarks of fabrication, and is not at all probable on its face, and, as before stated, we are inclined to give some consideration to the advantages possessed by the district court in weighing his evidence and that of the impeaching witnesses, all of whom gave their testimony orally. Upon the evidence of these three witnesses,—Niles, Carter, and Smith,—the appellant must rely for proof of recognition in writing. Others mention seeing a paper or hearing talk by Watson of support. In every instance their story is so improbable on its face, or so contradicted by statements out of court, as to be unreliable. For instance, Bradway testified that Watson showed him a paper and told him it was an agreement to maintain his son. But this witness had previously said to Reynolds and Stephens that he did not believe Watson had a son, or he would have known of it; and to Thomas, that his testimony would not hurt the Watson heirs, though he could color it to favor either party. For this reason they are of little value as corroboration. No one can read the evidence bearing on recognition in writing without being strongly impressed with its untruthfulness. From the fact of Watson preparing the adoption papers, the theory of an agreement for support has been evolved. The one witness (Niles) who must have known all the facts has furnished convincing evidence that it never existed. This alone has descredited Carter and Smith, whose stories are not probable, and they are impeached. Against all stands the will of Mott Watson, made in 1890 or 1891, leaving all his property to his nieces and nephews, and which was only destroyed because of his desire that it be distributed to them per stirpes instead of per capita. As the shadows

·gather about this lone man no mention was made, to his friends and acquaintances of thirty years, of a son for whom, according to Mrs. Wright and McCoy, his heart yearned, and on whom in babyhood others say he lavished more than a father's affection. None had ever been made to them, nor had they ever learned that he acknowledged such a relationship. These circumstances are entitled to much weight in a case involving the character of the deceased, who may speak in his own defense only through the life he lived.

VII. The evidence of rumors or current reports in the community where the deceased lived at or about the time claimant was born, that he belonged to Watson, or, subsequently, that he had such a boy, must be excluded. That such rumors often have their inception in jest, and are quite as frequently based on falsehood as truth is a matter of common observation. It has long been settled that such evidence will not be received to show pedigree. "The law resorts to hearsay in such cases upon the ground of the interest of the declarants in the person from whom the descent is made out, and their consequent interest in knowing the connections of the family. The rule of admission is therefore restricted to the declarations of deceased persons who were related by blood or marriage to the person, and therefore interested in the succession in question. And general repute in the family, proved by the testimony of a surviving member of it, has been considered as falling within the rule." Greenleaf Evidence, section 103; *Carnes v. Crandall,* 10 Iowa, 377; 18 Am. & Eng. Enc. Law, 257. Such evidence, even when so limited, is hearsay, and the exception in favor of receiving it is only because of the difficulty and often impossibility of obtaining better evidence of the facts sought to be established, which may have occurred many years before the trial, and because the adherence to ordinary rules might result in the manifest failure of justice. But as, by the statute, recognition of illegitimate children by the father, if not in writing, must

be general and notorious, before they may inherit, an essential inquiry in such a case is the extent to which such a recognition has become known and talked of in the community. The very evident purpose of the statute is to guard against the perpetration of fraud, which might not be difficult if inheritance depended on proof of paternity alone; for how were it possible to punish for perjury, or even to detect it in the testimony of witnesses who might furnish proof of relationship and recognition by recalling admissions of the deceased made when none other were present to hear? If, under such circumstances the cupidity and avarice of dishonest men are excited by the fair prospect of great gain, neither the estate nor the character of the dead would be safe from the fraudulent attack. *In re Jessup's Estate,* 81 Cal. 408 (21 Pac. Rep. 976).

For these reasons, not only proof of parentage and recognition are required, but, in order to confirm these, such recognition must be shown to be general and notorious. Webster defines "general" as "common to many, or the greatest number; widely spread; prevalent; extensive, though not universal." See 8 Am. & Eng. Enc. Law, 1292. In *Blair v. Howell,* 68 Iowa, 621, this court, though divided, held that an occasional denial by the putative father would not obviate a finding that recognition was general, and also that the notoriety of the recognition is sufficient, if as wide as the circumstances of the case will admit. "Notorious" is defined by Webster as "generally known and talked of by the public; universally believed to be true; manifest to the world." *Straus v. Insurance Co.,* 94 Mo. 182 (6 S. W. Rep. 698). See *Seay v. Walton,* 5 T. B. Mon. 368. Both of these words are used in the statute with the design of emphasizing the thought that the understanding of the father's recognition should be as extensive as the immediate community of his residence, and within the common knowledge of the public.

VIII.  The claimant was taken by Mrs. Niles to Nebraska in 1873, and, while after that there is evidence of occasional recognition, there is none tending to show it to have been general or notorious.  If Watson spoke of the claimant after that to any of those so testifying, singularly enough they never mentioned it to others during his lifetime.  The talk, if any were had, was always in the privacy of his own office, with none other to hear; and, though never cautioned to secrecy, no one was ever permitted to share the knowledge imparted, until the only one able to controvert their statement had departed forever.  Besides, some sixty-seven witnesses—all acquaintances of Watson for many years, many of them intimate, all living in Maquoketa or its immediate vicinity—declare they had never heard of any recognition by him of a son, or, indeed, that he had one. But did he recognize the claimant, during the first years of his life, while at Maquoketa, as his son?  The evidence of several witnesses, if accepted, established such recognition. But this was limited to the household of Mrs. Niles, with but two exceptions.  If Watson made efforts to find a lying-in place for Mary Jones prior to her confinement, it was with a view to avoiding publicity.  Mrs. Stevenson declares that, when speaking of the adoption by Mrs. Niles, he remarked: "Yes; it is her baby, but my boy."  Mrs. Curtis and Mrs. Gilman, employes of Mrs. Niles, testify to Watson visiting the child, giving him trinkets, and at one time bringing him a cab, and that he referred to him as "his boy."  Mrs. Eberly and Mrs. Orcutt, if they are to be believed, confirm this testimony.  That Watson took some interest in the child cannot be doubted, for this would be natural, even though he had no further connection with him than the preparation of the adoption papers.  Mrs. Wright, then an unmarried girl, insists that she talked with him of his liasion with Mary Jones, and of her offspring, and looked at it at his suggestion!  But she never mentioned this during his lifetime. E. W. Height speaks of Watson visiting the boy when being

kept by his mother during Mrs. Niles' absence in Chicago, and of Watson on one occasion admitting his parentage,— circumstances not recalled by his father or brother, and not referred to by him until after Watson's death.  All this evidence goes no further than tending to show recognition in the home of Mrs. Niles, and to the two witnesses who never mentioned it.  Watson was undoubtedly a man of importance in the small town of those days, and must have had a wide acquaintance.  None of his business associates knew of the alleged recognition.  That information was confined, with the exceptions mention, to employes of the household. The birth of an illegitimate child, and especially its general recognition by a father of Watson's standing, in so small a place, would not be likely to be forgotten.  Such an event is so unusual that few of the then residents would be unable to recall the particulars.  Certainly the claimant has failed to show any such general recognition or notoriety as is contemplated by the statute.  Indeed, a careful examination of the whole record, leaves it extremely doubtful whether Mary Jones was ever employed at the Decker House, or Watson had ever met her prior to the execution of the adoption papers.  We have reviewed the evidence at considerable length, because of the importance of the cause.  It has not been our purpose, however to set out all the evidence, as that would be impracticable, with abstracts containing over 1,600 pages of printed matter.  Only the controlling portions have been referred to.

In view of our conclusion, appellees' motion to strike requires no attention.  The decree of the district court was in accordance with the evidence, and is affirmed.—AFFIRMED.

WATERMAN, J., took no part.

GIVEN, J. (dissenting).—After a careful reading of this voluminous record, I am unable to agree with the conclusion of the majority.  I will not attempt to set out or discuss the evidence, and will add but little to a statement of

my conclusions. For convenience, I will designate the appellant as defendant, and the other parties as plaintiffs.

That the defendant is an illegitimate son of Mary Jones, born at the poor farm in Jackson county, Iowa, in December, 1869; that he was taken by Mrs. Niles in March, 1870, and reared by her in Iowa up to 1873, and thereafter in her homes in Kansas and Nebraska; and that Mary Jones disappeared immediately after Mrs. Niles took the child, and has not since been heard of,—are facts undisputed in the evidence. That Mary Jones was an employe in the Decker House in 1868 and 1869, while kept by Mr. and Mrs. Niles, and at which Mott Watson boarded, is established by a decided preponderance of the evidence. Six witnesses testify positively to a personal acquaintance with her while so employed in those years. That others do not remember her as an employe while they were working at that house does not necessarily contradict these six co-employes, nor the two other persons who testified that they saw her there. This apparent discrepancy may arise from a confusion of dates, a failure to remember names after so many years, and the fact that persons employed at different work in the house may not have become acquainted so as to remember each other. The fact that Mrs. Niles took the child confirms me in the belief that she knew Mary Jones because of her having been employed in the hotel. As I read this record, Mr. Watson was not, at his age in 1868, under such moral restraint as precludes the possibility of his having had the relations claimed with Mary Jones. True, he was received into good society, because of his outward demeanor, but more largely, I think because of his wealth; but he does not seem to have coveted that society, as he seldom went from his hotel, and was contented with the associations that surrounded him there. That he knew Mary Jones cannot be doubted, and that she was not wanting in attractions to one of Watson's age and circumstances fairly appears. I mention these facts, not as conclusive

upon the questions at issue, but simply to show that what is claimed was possible, and from this standpoint to inquire further. Though discredit is cast upon the testimony tending to show that Watson, with commendable purpose, sought to secure suitable care for Mary during her confinement, I am convinced that such is the fact. Watson, aware of the disgrace and legal consequences that might follow a public disclosure, proceeded secretly and cautiously in his efforts to find a lying-in place for Mary. With the limited opportunities afforded by the town, and his desire for secrecy, it is not surprising that he failed to procure a place, and was forced to allow the girl to go to the county house. The testimony as to these efforts is corroborated by what followed in the history of the affair. It seems to me that the evidence establishes by a very decided preponderance that the defendant is the illegitimate son of Watson. Soon after the child was taken by Mrs. Niles, Mary Jones disappeared from that community, and nothing further is shown as to her,— a fact that may be explained by subsequent statements of Mr. Watson as to what the affair had cost him. With Mary gone, and the child provided for, the fear of legal consequences had vanished; and the evidence shows that from that time forward Watson did not act with, nor enjoin, secrecy, as he had previously done. Before that time he talked only with those with whom it was necessary he should talk to provide for Mary and the child, but thereafter he generally spoke without reserve as to the paternity of the defendant. Twenty-seven witnesses testified to numerous conversations in which Watson admitted that the defendant was his son. These conversations were generally brought about by mention that it was so rumored, or in relation to what would become of his property at his death. I think the fact of such rumors was competent evidence, so far as brought to the knowledge of Watson, and as it tends to account for the conversations and to explain his statements. It is true, a number of reputable persons, intimate with Mr.

Watson, say they never heard him admit or refer to the defendant as his son; but it does not appear that, as between him and them, that subject was mentioned. It appears that on every occasion when the subject was mentioned, after the woman was gone and the child provided for, Watson directly or indirectly admitted the fact that defendant was his son, and it does not appear that on any occasion he made denial of that fact. The credibility of a number of the witnesses who testify to these admissions is put in question, but they are corroborated by what preceded, and their testimony as to their conversations with Watson is entirely reasonable, under the circumstances, and therefore may be given weight notwithstanding their impeachment. The fact that Watson once made a will in which defendant was not remembered cannot be construed as a denial of him as his son. Many reasons may account for that omission,—as a want of confidence in the ability of the boy to take care of the property. Whatever the reasons may have been, they failed to control the action of Mr. Watson, as is shown by the destruction of the will. That it was through Watson's influence that Mrs. Niles was induced to take the child seems to me to be well established,—a fact that goes far to corroborate these twenty-seven witnesses. That it was rumored that Watson was the father of this defendant cannot be doubted, and that the fact of this rumor was frequently brought to his attention, and he as frequently admitted that the defendant was his son, is equally well established. The facts that were held sufficient to show general and notorious recognition in *Blair v. Howell*, 68 Iowa, 619, were not stronger than the facts in this case. In that case Bowen sometimes denied that he was the father, but in this Watson, though often confronted with the facts, never denied it. It is said in that case that, the general bearing being such as involved a recognition, it follows that the recognition was general. Surely the general bearing of Watson towards the defendant, in providing him a home and care, as well as frequent recognition,

was general recognition.  This recognition, though not proclaimed to the public, was not concealed, but open to all who had occasion to observe, and therefore it was as notorious and general as the circumstances admitted.  I think that, allowing full force to discrediting testimony, it is established by a decided preponderance of the evidence that the defendant is the son of Mott Watson, and that Mott Watson generally and notoriously recognized him as such.

As to the evidence of recognition in writing in the contract claimed to have been made with Mrs. Niles for the support of the child, I think it is established that there was such a contract.  That Mrs. Niles took the child is undisputed, and it was reasonable that she should have desired compensation for rearing the child, especially if she knew him to be the child of Mr. Watson, who was amply able to pay.  Watson's desire was to avoid legal consequences, and, as I have said, with the mother gone, and the child provided for, this would be accomplished.  These being the facts, it was reasonable that Watson was ready to consent to a contract for the support of the child; hence I am the more ready to believe the witnesses who swore that such a contract was made, and those who say they afterwards saw it.  That the copy kept by Mrs. Niles is lost is shown by the fact that a search where, if not lost, it would be found, failed to discover it; and the same is true as to the copy kept by Watson.  The absence of Watson's copy from his papers may be accounted for by the fact that on the night of his death Eugene and Leslie Watson opened his safe and overhauled his papers.  True, they deny this, but eight witnesses testified that they did so.  That the contract existed, and that it is lost, are sufficiently proven to admit evidence of its contents, whatever may have been the cause of the loss.  There are some discrepancies between the witnesses as to the details of the contents of the contract,—a fact which I think does not detract from their testimony.  They all agree that it was a writing in which Mott Watson recognized the

defendant as his son by contracting for his support. There is certainly much room for the criticisms that are made pro and con upon the credibility that should be accorded to the evidence, but I do not think we are justified in the wholesale rejection of the evidence that the plaintiff's demand. I find no warrant for disbelieving the several witnesses who testify to Mary Jones' employment in the Decker House, nor the several witnesses who testify to Watson's efforts to secure care for Mary during her confinement. I do not think we are warranted in entirely rejecting the testimony of the several witnesses who swear to the existence and contents of the contract, nor the large number of witnesses who testify to Watson's repeated recognition of the defendant as his son. I appreciate the disadvantages under which the plaintiffs labor in combating this evidence on behalf of the defendant, but, summing it all up, I reach the conclusion that the defendant has established by a decided and convincing preponderance of the evidence that he is the son of Mott Watson, and that Mott Watson generally and notoriously recognized him as such, and also so recognized him in a written contract with Mrs. Niles. I think we should reverse.

GRANGER, J., concurs in this dissent.