NELLIE FINGER, Appellant, v. LENA ANKEN ET AL.

**Wills:** CONTRACT TO DEVISE: EVIDENCE: SUFFICIENCY. The evidence in this action is reviewed and held insufficient to establish an agreement on the part of decedent that if plaintiff would live with his family he would leave her a portion of his estate.

*Appeal from Scott District Court.*—HON. A. P. BARKER, Judge.

FRIDAY, JUNE 9, 1911.

SUIT to establish title in two-thirds of the estate of

David Anken, deceased, resulted in the dismissal of the petition. The plaintiff appeals.—*Affirmed.*

*Wade, Dutcher & Davis* and *Ely & Bush,* for appellant.

*Lane & Waterman,* for appellees.

LADD, J.—The parents of plaintiff resided at Rock Island, Ill. Her mother died in 1880, and her father three years afterwards. Three children survived them. Albert, who was adopted by Charles H. Ritter, Thomas L., who was born in 1871 and lived with Ritter from 1883 until 1887, and the plaintiff. The latter was cared for by one Marshall for about a year and a half after her mother's death, and then took up her home with Ritter, who, at the father's instance, undertook to find her a suitable home. In doing so he addressed a letter to his acquaintances David Anken and wife explaining the situation and the joy of having an adopted son, and suggesting that he had "a bright, nice and very good looking sister as sweet as a peach whom we have now in our family and for whom we are looking out for a good home;" that he had concluded to inform them of the fact, and requested that they let him know as soon as possible if either had a disposition to adopt a child. As a result, plaintiff went to Ankens in the fall or winter of 1885 for about a month, when, according to the testimony of her brother, Thomas, she returned to Ritter's home, where she remained nine months or a year, and then returned to the home of Anken, where she lived until her marriage October 19, 1898. David Anken died testate October 19, 1908, and his will leaving all his property to the defendant, his widow, has been admitted to probate. The plaintiff claims two-thirds of the estate because of the alleged agreements testified to by Thomas L. Clinton. According to this wit-

ness, Anken repeatedly requested Ritter after plaintiff's
return to him to allow Anken to take her to live in his
family, and that he was present when the finally arranged
that Mr. Anken should have her. He testified that: "Mr.
Anken said to Mr. Ritter, 'You better leave me have Nellie,
and better leave me take her over and live with me.' And
Mr. Ritter said: 'Mr. Anken, if you want to take Nellie,
you must take her over and adopt her as your own child,
and leave her have a child's share in your estate. If you
will do that, you can have Nellie.' Mr. Anken agreed to
that. He said: 'Charlie, I will agree to that. I was
very much attached to Nellie the last time she was over.'"
The witness further testified that: "Mr. Ritter turned
right around to him at the desk, and said, 'Tom, don't
you think that would be far better for Nellie? Anken is
better fixed than I am, and could do more for her, and,
in fact, Nellie would be well fixed.' And I said, 'I think
it would; whatever you agree to.'" The witness was
then fourteen years of age. He testified, further, that he
went to Mr. Anken's home at different times to visit his
sister, and that he and Anken would go over to the Turner
Hall and have beer and that at one time he said: "Mr.
Anken, do you think it is anything more than right that
I ask you to make out these adoption papers for my sister
as you agreed to with Mr. Ritter." And he said then, in
substance, to him: "'I went up to have them made out
at first, but there was some hitch in it about your mother's
maiden name. Nellie could not give it. Could you?' And
I said, 'No; I don't know it myself,' and he said, 'I will
have those papers made out, I have been putting it off.'"
The witness also testified that shortly after he was mar-
ried on November 22, 1893, he had a conversation with
Mr. Anken at the hall where they had gone for beer,
when he said to him: "'Mr. Anken, I am married and
have a home of my own, and I want Nellie to come and
stay with me and my wife, and she would be company for

her while I am out on the road.' And he said: 'No, no; I could not think of it now. I could not part with Nellie at all. She is just the same as my daughter.' And I said, 'Mr. Anken, you have never done what you agreed and made them papers out.' And he said, 'Tom, you leave her with me. I could not think of parting with her. You leave her with me, and I will fix up the papers and she will have a child's share in the estate the same as my own child.' And I said: 'Mr. Anken, if you will do that now, as you say, why it is all right. I have not got nothing, and that would be better for my sister in the future.' "
This is the only direct testimony concerning the alleged arrangement under which the plaintiff made her home with David Anken and his wife. That Anken and his wife became greatly attached to her and regarded her with practically the same consideration and affection as though she had been their own daughter is put beyond cavil by this record. In all respects she was treated as a daughter, and, in return, gave to them a daughter's confidence and love. Moreover, the record leaves little, or no doubt, of decedent's expectation as well as that of his wife that plaintiff should share generously in the property he might leave. He talked of willing a portion to her, and mentioned what she would do when she had his property; while his wife seems to have repeatedly assured her that she would be well paid for all that she did in their interest. But evidence of this kind furnishes slight, if any, corroboration of the alleged contract. While it was consistent with an agreement to leave property to plaintiff, it was not inconsistent with the absence of such an agreement. It no more than indicated the cordial and affectionate relations existing between the parties and evidenced the intentions then existing. But the testimony of Clinton that decedent undertook to adopt plaintiff finds stong corroboration in the testimony of several witnesses, and much of appellant's argument proceeds on the theory that, if decedent promised

to adopt, plaintiff is entitled to recover.  If so, such re-
covery must be for damages resulting from the breach of
such contract or by way of specific performance.  The lat-
ter would now be impossible owing to the death of Anken,
and, moreover, it is doubtful whether, as the manner of
adoption is statutory with terms specifically prescribed· and
exacting written consent of the parties and relinquishment
by those possessing rights to and over the child, specific
performance ever would be decreed in such a case.  See
*Kofka v. Rosicky,* 41 Neb. 328 (59 N. W. 788, 25 L. R.
A. 207, 43 Am. St. Rep. 685) ; *Long v. Hewitt,* 44 Iowa,
363.

Even if this were possible, however, no advantage
could be attained thereby for adoption would not confer
rights greater than that of a natural child and these would
be of no avail as against disposition of property by will.
Nor is it perceived on what theory damages might be re-
covered, for, had plaintiff been adopted as we think, Anken
promised her status would not have been other than that
of a daughter, and this would not have entitled her to
any interest in the property as against its testators disposi-
tion.   To authorize a finding in plaintiff's favor, there
must have been something more than an agreement to
adopt.   There must have been a distinct promise that upon
his death plaintiff should share in his estate.

No one testified to this other than Thomas L. Clinton,
and his testimony in this respect finds no corroboration
save its consistency with decedent's expectations as men-
tioned above.   The persons whose conversations he under-
took to repeat after the lapse of more than twenty-three
years have departed this life.   His story is without con-
tradiction, and its credibility can only be tested by com-
parison and the ordinary rules of human conduct.   *Holmes
v. Connable,* 111 Iowa, 298; *Watson v. Richardson,* 110
Iowa, 673.   He was then but fourteen years of age, and his
subsequent testimony indicates his anxiety not that Anken

leave a child's share in his property, but that he execute
adoption papers, and this is true of other witnesses testify-
ing to conversations with decedent concerning the adoption
of plaintiff.    Thus no mention was made of this feature
of the alleged arrangement with Ritter in Clinton's talk
with Anken at Turner Hall, and in that after his marriage
he does not claim to have spoken of his promise as to
property, but says at that time that decedent after saying
he would fix up the papers added "and she will have a
child's share in the estate the same as my own child."
This if said was entirely consistent with the thought that
he was expressing his notion of the effect of such adoption.
It did not purport to be an admission that he had agreed
to leave her a child's share of his estate.    She was then
with him under the arrangement with Ritter, and Clinton
had no control of her.    He was without right to her cus-
tody, and no court properly could have given it to him even if
he had elected to take her with him.    Even if the con-
versation between decedent and Ritter took place, it is not
at all clear what the parties intended.    If, as Clinton testi-
fied, Ritter said to Anken, "If you want to take Nellie,
you must take her over and adopt her as your own child
and leave her a child's share in your estate"—and he an-
swered that he would "agree to that," what was the
understanding, that the plaintiff was to be assured a child's
share of the estate independent of the adoption or as the
result of adoption?    If it was not the intention that the
child's share should be in pursuance of the adoption, what
was meant thereby?    Was she to have all that she would
have inherited had she been his own child or merely to be
treated as though his child in the distribution of property
after death?    The adoption would confer the right to in-
herit and for this reason, the parties in what they said
might well have had this in mind.    Moreover, the witness,
after the lapse of so many years, could not well be expected
to reproduce the exact language of the parties, and, having

in mind the effect of adoption on their child's property rights, may have confused his conclusion with respect thereto with what was actually said. His subsequent anxiety concerning adoption must have been owing to such adoption conferring the right of inheritance, for no other advantage is apparent from the record. If there was such a contract, she knew of it, and yet she was shown to have stated that she would acquire no property of deceased except by will, and, though aware of its contents, induced decedent to sign it shortly before his death. Her excuse is that she did so on the assurance of his wife, the defendant, that the latter would do right by her. If she were entitled to a child's share of the estate, why barter it away on an indefinite promise of another to do right? Again, according to her story, while she was sitting at the bedside of decedent in the night following, he inquired "Where is that paper [the will]?" and she responded, "I haven't got it" (though she had placed it in a black bag). He asked, "Are you sure?" and, after reaching the bed added: "Nellie, do you know I am afraid we are stuck." She responded: "Don't worry, papa; mamma will do the right thing by me," and with the exclamation, "No, no," the conversation ended. If he had disposed of his estate in violation of his obligation to her, why did she not produce the will and enable him to undo the wrong? Again, she testified that, when she and the widow were standing by the grave of decedent, the latter had said: "Poor soul, he did not want me to have it all. O, Nellie, if the relations knew this, they might contest it." And that she replied: "Mamma, I will stay with you through thick and thin. You have got to do the right thing by me," and the widow so promised. If the will deprived her of the estate, and its execution was a fraud on him whom she loved as a father, would she have given it up for such a promise? Her husband attended to the probate of the will, and not until it had been admitted to probate, and

plaintiff was denied financial help by the widow, did she raise any objection to it. The record leaves little doubt but that plaintiff desired deceased to leave his estate to the widow, and that this was with the notion that the latter would deal more generously with her financially than decedent. Her conduct as well as that of her husband was entriely inconsistent with any legal claim on decedent for any interest in his estate. Only upon the widow's abrupt and somewhat discourteous refusal of assistance was the claim now urged insisted upon. Nothing will be gained by a more extended review of the evidence.

Enough has been referred to to disclose that it fails to establish an agreement that, in consideration of plaintiff living with decedent, he would leave her a portion of his estate by that strictness of proof exacted in such cases. See *Stiles v. Beed,* 151 Iowa, 86.—*Affirmed.*