CHAS. A. LUCE, Appellee, v. MINNIE TOMPKINS et al., Appellants.

**DESCENT AND DISTRIBUTION: Persons Entitled—Paternity—**
1 **Evidence.** Evidence reviewed, and held sufficient to sustain a finding that plaintiff was a son of deceased.

**DESCENT AND DISTRIBUTION: Persons Entitled—Paternity—**
2 **General and Notorious Recognition.** General and notorious recog-

nition of the paternity of a child may be established even though there is a showing of occasional denials of such paternity by the putative father.

**DESCENT AND DISTRIBUTION:** Persons Entitled—Paternity—
3 Notorious Recognition. General and notorious recognition by a putative father of the paternity of a child need not be such that it was known to even a majority of the people in the community.

*Appeal from Clarke District Court.*—H. K. EVANS, Judge.

THURSDAY, JUNE 29, 1916.

THIS is an action brought by Chas. A. Luce to partition real estate. Afterwards, it became necessary to sell the real estate to pay debts and settle the estate, and an order was made in regard thereto, and that the case should proceed and the question be litigated as to whether plaintiff is the son of William S. Luce, deceased, and whether he is entitled to inherit from and participate in the estate. About 45 witnesses were examined, and, at the conclusion of the trial, the trial court found for plaintiff, and decreed and determined his right to participate in the estate to the extent of one eighth thereof. The defendants appeal.—*Affirmed.*

*O. M. Slaymaker,* for appellants.

*V. R. McGinnis* and *Temple & Temple,* for appellee.

PRESTON, J.—It is conceded by both sides that there is but one question for determination, and that a question of fact. The question is whether plaintiff has established by sufficient and satisfactory testimony that he
1. DESCENT AND DISTRIBUTION: is the son of William S. Luce, deceased, and persons entitled: entitled to participate in the distribution of paternity: evidence. his estate. The plaintiff contends that he is the son of said decedent, while defendants, who are children of said deceased, insist that he is not such. The record is quite a large one, and it is impossible, of course, to set out within proper limits of an opinion all the evidence,

or even a synopsis of all of it, nor would it serve any useful purpose to do so. We shall attempt to review the testimony in a general way and state our conclusions. The case was tried as in equity, and the evidence was all admitted, much of it subject to objection. Some of the evidence on both sides is hearsay and incompetent, although perhaps some of the testimony which would otherwise be hearsay is competent as part of the family history. Some of the witnesses are incompetent under Section 4604 of the Code. This is more particularly true, perhaps, as to some of defendants' witnesses; but, as stated, much of the evidence is incompetent and hearsay. The testimony of seven or eight of the witnesses was in the form of depositions, so that as to them we can judge as well of the weight of their testimony as the trial court. As to the others, under the rule often stated, the trial court is in a better position to weigh their testimony than is this court. A number of witnesses testify as to the general recognition by deceased of the plaintiff as his son, which plaintiff claims is competent as bearing upon the question as to whether or not plaintiff was in fact the son of deceased, and, as we understand it, defendants concede that, in view of the fact that deceased married plaintiff's mother after plaintiff's birth, it is only necessary for plaintiff to prove that he is in fact the son of deceased in order to establish his claim.

It may be well, perhaps, to state as briefly as may be the general situation, before referring to the evidence of the different witnesses. Plaintiff was born some two or two and one-half years prior to the time that his mother married deceased. W. S. Luce, the deceased, married Jane McVicker, the mother of plaintiff, at Bradford, Stark County, Illinois, November 4, 1861. Neither had been married before. At the time deceased married her, she had a son, Charles. The plaintiff is such son. A half sister of Jane Luce's says that plaintiff is the son of a man by the name of Carlyle. W. S. Luce was born in 1840, and the lady he afterwards married was about two years his senior; she was born in 1838. Deceased, William S. Luce,

enlisted in the Union Army some time about August, 1861, went to Chicago, where his company was stationed, but thereafter returned to his home in Stark County, Illinois, about November 1st of the same year, and married plaintiff's mother, Jane McVicker, and in about ten days thereafter returned to his company, went with it to the war and did not return home for some two or three years. During his absence, his wife, with the plaintiff herein, made her home with the father and mother of said William S. Luce. The said William S. Luce and Jane Luce had born to them during wedlock, six children. The wife of deceased, Jane Luce, died in 1881, and in 1890 he married again, and of this union one child was born. So that deceased left seven children, and, if it be established that plaintiff is also the son of deceased, then he is entitled to a one-eighth share in the estate. Deceased and the second wife were divorced. The estate of deceased amounts to between $20,000 and $25,000.

Plaintiff testified as a witness, but some of his testimony is incompetent, under Section 4604. Over 20 other witnesses testified for plaintiff. We shall now refer to the testimony, but only in a general way. The fact that deceased married plaintiff's mother after he had enlisted in the army has already been referred to, and that his wife and plaintiff continued to live with the parents of deceased. We regard this as a strong circumstance in plaintiff's favor; that is, that after the marriage the wife and plaintiff made their home with the parents of deceased until deceased returned from the army. The fact that after deceased had enlisted in the army and was about to leave Chicago for active service in the war, he went back and married plaintiff's mother with the purpose of righting, in so far as it was possible to do so, the mistake that he and Jane McVicker had made and to give plaintiff a name, indicates very strongly to our minds that he thought he might be killed in battle, or die of disease in the army, and this fact is strongly corroborated, we think, by the fact that he did take plaintiff into his family after his return from the

army. After deceased returned from the army, plaintiff lived with deceased and his mother in Illinois, thereafter coming to Iowa, about 1877. Plaintiff lived with deceased and his mother as other members of the family, and aided the father and mother in paying for the property that is now in question. The brother of deceased testifies that plaintiff went by the name of Charlie Luce from a time soon after the marriage. The relations between plaintiff and deceased were always pleasant and agreeable, and deceased seems to have had as much concern for plaintiff as for any other child or member of his family. Many of the neighbors never heard of the claim that plaintiff was not the son of W. S. Luce until after the death of deceased. Deceased at one time told witness Smith that he had eight children, and mentioned their names, including the plaintiff, and told him that plaintiff would need his part and portion of the estate. A number of witnesses testify that plaintiff was generally and notoriously recognized by deceased as his son. On one occasion, W. S. Luce visited one Kelly to collect an account for plaintiff, and told Kelly that plaintiff was his son. Plaintiff attended school the same as the other members of the family, and was, according to the testimony of plaintiff's witnesses, generally and notoriously recognized by deceased as his son. Deceased told one Jones that he had eight children and it was his intention to make no difference among them; and he called plaintiff his son. To the same effect is the testimony of witness Clark, and others, including one Fairall, to whom he said that he had a son Charles, who lived at Weldon. To another witness, Harless, deceased said that he had four boys and three girls by his first wife and one child by his second wife; that his son Charlie lived at Weldon. To the same effect is the testimony of Puckett, Morrow and others.

The testimony of witness Pollock and wife strongly supports plaintiff's claim. Their testimony is, in substance, that they have known deceased forty years, and lived in the neighborhood during that length of time. At a time after

deceased married his second wife, deceased and his wife were visiting the Pollocks and they were each discussing their children. The talk was that the Pollocks had four boys and three girls, and deceased remarked that he and his first wife had raised seven children, four boys and three girls, just as the Pollocks had. Quoting from their testimony:

"His wife said, 'I guess Charlie ain't yours,' or 'Charlie isn't your son,' and deceased said, 'Charlie is my son,' and she repeated again; and he pointed his finger directly at her and repeated it and emphasized it a little that, 'Charlie is my oldest son.' He said, 'Charlie is just as much my child as Iva,' or 'Charlie is just as much my son as she is my daughter.' (Iva is the name of the child of deceased by the second wife.) He reproved her for bringing it up. She said the next day, she was sorry she said it on Will's account (meaning deceased), for Will told her that Charlie was his, but was born before he should have been. She told me that the next day, stopped on the way to Leslie and said for me not to mention it. I had never heard prior to that time that he was not a son of deceased, but that he was born before he should have been."

These witnesses testify that they heard about plaintiff's losing his property by fire, and deceased stopped at their house after that time and spoke of plaintiff's financial condition, and said some people thought that Charlie would go broke, but he didn't; he was willing to do what he could; that he had been down to help him; that he had arranged so plaintiff could get money; and they testify that deceased said Charlie was a good boy, was the oldest and had a great many hardships.

Another circumstance which we regard as tending very strongly to sustain plaintiff's claim is that a certified copy of the government census return taken in the year 1880 was introduced in evidence, showing the names of William Luce, aged 40; Jane Luce, wife, aged 42; Charles Luce, named as son, aged 20; and the names of the other children of the

deceased and wife who had been born at that time; also cer-
tified copy of the government census return taken in the year
1870, giving the name of William Luce, whose age is given as
28; Jane Luce, whose age is given as 31; Charles Luce, whose
age is given as 11; and three other children of the parties,
who had been born at that time and who are defendants in
this action.   The evidence of the witnesses mentioned is given
much more in detail than we have stated, and there are
other circumstances and other witnesses tending to support
plaintiff's claim.

On behalf of the defendants, testimony was given by the
defendants, and other relatives of deceased, tending to show
that plaintiff was not a son.   This testimony will be referred
to in the same manner that we have attempted to give the tes-
timony on behalf of plaintiff.   It is argued by counsel for
defendants that, though possible, it is improbable, because, at
the time plaintiff must have been conceived, the deceased was
but 18 years of age.   As stated, the mother was two years his
senior.   And it is thought by appellants that, if deceased was
the father of plaintiff, it is improbable that he should wait
until the child arrived at two and one-half years of age before
marrying the mother.

Defendant Minnie Tompkins testifies that, after her
mother's death, deceased came to her bedroom and told her
that he knew her mother only six or seven months before he
married her, and told her that:

"What property I have you know will be divided between
you children now that your mother is dead."

And she says that at another time, when plaintiff had
gone to a neighbor's, deceased refused to hitch up a team and
go after him, saying that he was not his son.   She says further
that it was generally understood in the Luce family that
plaintiff was not a son; that it was generally supposed that
he was not; and she says that she never heard the Luce family
or the McVicker family claim that plaintiff was the son of
deceased.   She says that plaintiff's name was not recorded in

the Bible of her grandparents, but his name was recorded by her aunt in her mother's Bible; that this Bible was burned in her sister's house; that plaintiff's name was recorded in that Bible, but it was just Charles at that time, and that plaintiff added the A. himself after witness was grown; that she heard her mother say to plaintiff that he was not a son of deceased.  This is denied by plaintiff in rebuttal.

Another defendant testifies that she had been told that plaintiff was not the son of her father; that other members of the family never claimed any relationship with plaintiff; that, at the death of deceased, plaintiff told her that he had heard he had been adopted when he was young; that plaintiff did not at that time make any claim to being a son of deceased; and that he said he knew he was not.

This is denied by plaintiff in rebuttal, as is all like testimony from other witnesses.  Other defendants give similar testimony.  Another witness testifies that she heard plaintiff's mother say that he was not the son of deceased.  Another witness testifies that, at a time when he and plaintiff were attending school, plaintiff knocked witness down in the mud, and witness jumped up and told him he was a darned bastard; that his uncle Lon Luce said so.  The same witness says that he heard others speak of it at different times that plaintiff was not W. S. Luce's son, but did not know it for certain until he heard Lon Luce tell it.  Other witnesses testify to hearing talk in the neighborhood that plaintiff was not the son of deceased.  Another witness testifies to a conversation with the brother of deceased, who said that plaintiff was not the son of deceased; that plaintiff was a boy the wife of deceased had before they were married.  Another witness testifies that, at a time when deceased seemed to be angry at plaintiff, deceased said that plaintiff was not his son.  This witness is the husband of Minnie Tompkins, and says that, since he married into the family, he has not heard it claimed by members of the family that plaintiff was the son of deceased.  Another witness says she had heard, though not frequently, only once in

a great while, that plaintiff was not the son of deceased. Another witness testifies that Alonzo Luce, the brother of deceased, who is now dead, told him that plaintiff was not the son of W. S. Luce. Another witness, 84 years of age, a half sister of plaintiff's mother, who, at the time of the marriage of plaintiff's mother and deceased, lived in Stark County, says she was not present at her half sister's marriage, but was present when plaintiff was born; she says that her people did not know deceased before he moved to Stark County, and that plaintiff's mother did not know William Luce at the time plaintiff was born. This is the witness we have before referred to who claims that plaintiff was the son of one Carlyle, and that plaintiff's mother stated that Carlyle was plaintiff's father. She says later in her testimony that plaintiff's mother did not tell her that she was not acquainted with the Luce family. She says that plaintiff lived in the family of deceased and that they got along all right. Another witness testifies that planitiff's mother told her that plaintiff was not the son of deceased. A sister of deceased's testifies as to plaintiff and his mother's living in her father's family about three years after deceased was married, and until after deceased came home from the army; that she never heard plaintiff's mother tell her anything about who plaintiff's father was, but she thinks she told witness that plaintiff was not the son of deceased. She says that after deceased returned from the war, he moved to a separate home, and she does not think that deceased during this time ever recognized Charles as a son at all; that plaintiff was always considered as an illegitimate child and was not recognized by the family as the son of deceased. She testifies to an occurrence some three years before plaintiff's mother died, of the mother's saying that she wanted plaintiff to have his share, because he would not get anything out of the estate if she was to die. The husband of the witness last referred to testifies that since he married into the family he never heard or understood that plaintiff was the son of

deceased; that his understanding was that he was not such; that plaintiff's parentage was kept a family secret.

Witness Foster testifies that he was in the army in the same company with deceased; that he knew the Luce family when they lived in Bradford, Stark County, Illinois, and knew Jane McVicker, whose family lived at that time a mile and a half northeast of Bradford; that, when he first knew Jane, in 1860 or 1861, she had a child about two and one-half to three years of age, who went by the name of Charles; that he did not know what the understanding was in the community in which the McVicker family resided as to who was the father of Charles; that he never heard, but that it was generally understood that he was not the son of deceased, William S. Luce; that he had never had any conversation with deceased in regard to his family; that deceased never told him anything about this boy.

Witness Plummer testifies that he knew deceased in 1857, when he first came to Bradford, Illinois,—went to school with deceased; that Jane McVicker worked for his mother about 1860 or 1861; that Jane McVicker's parents moved there along in 1860, and lived about two miles from Bradford; that, when Jane worked for his mother, she had a little boy that she called Charlie; that Jane was married after she left his mother's; that Jane never told witness anything about the parentage of the child; that he never heard in the neighborhood that deceased was the father of such child.

Witness Hammer, 46 years of age, living in Kansas, formerly Carrie Luce, niece of deceased, says that, at one time, she heard plaintiff's mother have a conversation with grandmother Luce concerning her misfortune when a girl; that the grandmother of witness told her about the trouble which plaintiff's mother had before her marriage, and that a girl meeting with that kind of misfortune should not be condemned; that the grandmother of witness told her that plain-

tiff was not the son of deceased; that plaintiff was about three years old when deceased was married.

This indicates, in a general way, the character of the testimony introduced, and is really the substance of it, although it is very unsatisfactory sometimes to attempt to deal with a long record where the question is purely one of fact. It is thought by appellants that the testimony of defendants' witnesses is more direct, positive and certain than that of the plaintiff, and, as they state, that after having read it one is amazed at the decision of the trial court. But the testimony does not so impress us. Much of it is hearsay; some of the witnesses are very old and testify to transactions that occurred many years before;.many of them are interested, either as parties or relatives of the parties; and, after having read the record, we are satisfied with the finding of the trial court.

It is true that defendants have introduced testimony of a few instances, extending over a long period of years, wherein there are occasional denials by deceased. But we have held, in cases where it is necessary to show general recognition, that an occasional denial by the putative father would not obviate a finding that a recognition was general and notorious. *Watson v. Richardson,* 110 Iowa 673.

2. DESCENT AND DISTRIBUTION: persons entitled: paternity: general and notorious recognition.

And we have also held in such a case that recognition,.to be general and notorious, is not required to be universal or made known to all or a majority of the community. *Tout v. Woodin,* 157 Iowa 518, and cases. So that the negative testimony of some of defendants' witnesses that they had not heard deceased recognize plaintiff, is not, to our minds, as strong as testimony of other witnesses who say that they did hear deceased recognize him and admit that he was his son.

3. DESCENT AND DISTRIBUTION: persons entitled: paternity: notorious recognition.

The opinion is already too long. We deem it unnecessary to further discuss the matter. Our conclusion, after a

reading of the record, is that the decree of the district court was right, and it is, therefore,—*Affirmed.*

EVANS, C. J., DEEMER and GAYNOR, JJ., concur.