DORA TRIER, Appellee, v. KATHARINE SINGMASTER et al., Appellants.

BASTARDS: Paternity—General and Notorious Recognition—Subsequent Denials—Effect. General and notorious recognition, by a putative father, of the paternity of an illegitimate child, may be established by the *conduct* of the putative father, as well as by his *words;* and such recognition, *once fully established,* is not overthrown by evidence of subsequent denials of paternity. (Sec. 3385, Code, 1897.)

EVIDENCE: Admissions—Settlement of Bastardy Proceedings. *Arguendo,* it is asserted that the act of a defendant in bastardy proceedings, in making a financial settlement of the proceeding in favor of complainant, is a persuasive admission of the paternity of the child in question.

**BASTARDS:** Paternity—Evidence—General Repute.  General re-
pute throughout a neighborhood and among the family of a pu-
tative father that he was the father of an illegitimate child,
when supplemented by substantive facts tending to show that
he was such father, in fact, is admissible on the issue of pater-
nity.

*Appeal from Washington District Court.*—JOHN F. TALBOTT,
Judge.

MAY 17, 1918.

REHEARING DENIED SEPTEMBER 20, 1918.

THE plaintiff is the illegitimate child of one Thomas
Singmaster, and brings this action to establish her right to
participate in his estate, and for partition.  Decree for the
plaintiff in the court below.  Defendants appeal.—*Affirmed.*

*Mohland & Kuhlemeier* and *Eicher & Livingston,* for ap-
pellants.

*Hamilton & Beatty* and *C. C. Hamilton,* for appellee.

GAYNOR, J.—Thomas Singmaster died December 31,
1915, intestate.  He was a married man at the time of his
death, and left surviving him the defendant Katharine Sing-
master, his wife, and the other defendants,
his children.  He was possessed of a large
estate in lands.  This action is brought to
partition these lands.  The plaintiff alleges
that she is an illegitimate daughter, and as
such, is entitled to an undivided interest in his estate.  She
claims that deceased recognized her as such, and that such
recognition was general and notorious.  The plaintiff was
born on the 13th day of April, 1889, at the home of Samuel
Singmaster, the father of Thomas.  Her mother, Mary Rowe,
was an unmarried woman, and had, for a number of years,
worked as a domestic at the home of Samuel, whose fam-
ily then consisted of his wife and his son, Thomas.  Thomas

*(margin note: 1. BASTARDS: paternity: general and notorious recognition: subsequent denials: effect.)*

was then an unmarried man. Samuel was an extensive farmer and stock raiser, farming a great many acres of land, and employing considerable help in and about his business. Plaintiff's mother, at the time of plaintiff's birth, was about 39 years of age. Plaintiff claims under the provisions of Section 3385 of the Code of 1897, which provides:

"They shall inherit from the father when the paternity is proven during his life, or they have been recognized by him as his children; but such recognition must have been general and notorious, or else in writing."

Katharine Singmaster, who was the wife of Thomas at the time of his death, admittedly is entitled to a one-third interest in the lands sought to be partitioned. Mary Eve, Margaret Lillian, and Thomas C. Singmaster, his legitimate children, are entitled to equal shares of the balance of his estate, unless plaintiff has established her claim to an equal share with them in the estate so sought to be partitioned. It follows that, if she has established her heirship, she is entitled to share equally with the other children of Thomas Singmaster.

This presents two questions:

(1) Is the plaintiff, Dora Trier, the illegitimate child of Thomas Singmaster, deceased?

(2) Did Thomas Singmaster generally and notoriously recognize her as his child?

Both these issues were determined by the lower court in favor of the plaintiff, and the defendants appeal.

These questions are questions of fact, to be determined from the record before us. The evidence so intermingles these questions that the answer to each must be found in the whole record.

The first question is not difficult of solution. A reading of all the evidence satisfies us that, on the first proposition, the judgment of the court is correct. The evidence supporting plaintiff's claim is, in substance, as follows:

The plaintiff is the child of one Mary Rowe, and was born April 13, 1889. Mary Rowe was living at Samuel Singmaster's, at the time the plaintiff was born. Thomas was living there, with his father and his mother. Mary was a domestic in the home, and had worked there for some years prior to the birth of the child. Thomas lived with his parents, and in the home in which plaintiff's mother worked, during all the time she worked there, and was unmarried. Prior to plaintiff's birth, an agreement of marriage existed between Mary and Thomas. The child was born in the home of Samuel Singmaster. The child and mother were cared for in that home during the confinement, and for several weeks thereafter. During that time, and when the child was but a few days old, Samuel was heard to remark:

"Without any doubt, it is Tom's child; but it's human, and we have to take care of it, but we don't know what to do with it."

The record shows that, during the time plaintiff's mother was confined at the home of Samuel, Thomas visited her in her room, talked marriage with her, said he would marry her if it were not for his mother's interference, shed copious tears, kissed plaintiff's mother, and recognized the child as his. Upon recovering from her confinement, she was taken to the home of one Mrs. Diggs, and there cared for by Mrs. Diggs. It appears that she was taken to Mrs. Diggs at the request of Samuel Singmaster, and the expenses incident to her care at this home were paid for by the Singmasters,—it does not definitely appear whether by Samuel or by Thomas. Plaintiff's mother testified that Thomas is plaintiff's father, and that, after the child was born, Thomas still declared his purpose to marry her, but deferred the consummation of his purpose in deference to his mother's wishes and her declared opposition to such union. It is suggested in the record that his mother desired Thomas to

marry the woman whom he subsequently married, and who was his wife at the time of his death. Thomas continued a single man for 11 years after the birth of this child. During this time, he frequently visited the plaintiff and her mother, both while at Mrs. Diggs' home and while she resided at other places, not far distant from the Singmaster ranch. He was seen to caress the child; was seen frequently in conference with her mother. The mother frequently visited the home of Samuel, and was received there apparently on friendly terms,—at least, without objection. He was seen to give the plaintiff and her mother money. He was seen visiting the mother and carrying with him parcels, and was known to remain there for some time. The record shows that it was generally understood in the community, and was a matter of common talk, that Thomas was the father of the plaintiff; that this was not confined to a gossiping public, but was the thought in the minds of all the members of the Singmaster family, and of all who worked in and about the Singmaster ranch. This all occurred 27 years ago, and all the witnesses lived in and about the locality in which plaintiff was born; lived there at the time of the occurrence of her birth. None of them indicated doubt as to the parentage of this plaintiff, and there is nothing disclosed in this record that would lead the mind to believe that any member of the Singmaster family ever doubted the paternity of this child. Indeed, there is much in the record to indicate that, during all these years, the members of the Singmaster family believed that Thomas was the father of this child. Samuel so expressed himself, soon after the child was born. No man knew Thomas better than his father did. No man had a better opportunity to observe the relationship that existed between Mary and Thomas. No one was in a better position to form a correct idea as to the true relationship existing; and yet, soon after the child was born, he said, "It is no doubt Thomas' child." Further than that, the record discloses

that this plaintiff bears a strong resemblance to some of the Singmaster family, notably to a sister of Thomas's. One of the Singmasters testified to a strong resemblance to one of Thomas's sisters. This witness was the daughter of Thomas's sister. She testified that the plaintiff resembled her mother's sister, and that, in the Singmaster family, Thomas was generally reputed to be the father of the plaintiff. She said:

"I remember of hearing of the plaintiff's birth at the Singmaster home. I lived near by at the time. I visited the Singmaster home frequently since her birth, and know that it was reputed generally in the family that Thomas was the father of the plaintiff. The resemblance between Dora and Mrs. Ramge (sister of Thomas) is very strong. Their eyes and expression are very much alike in many ways."

Another witness testified to the same effect.

There are other incidents appearing in the record which confirm us in the belief that Thomas was the father of this plaintiff, and recognized her as such. It appears that, at one time before the birth of plaintiff, he was warned against his relationship with plaintiff's mother, and was told "that he better look out, or he would get his foot in it," and he replied that he "didn't think so; that she was too old." Another time, after the birth, one of his friends asked him, "How did you happen to get caught in the scrape?" and he remarked, "Lots of fellows get their foot in it if they keep on."

Another witness, who said he was acquainted with all the parties to the suit, and had known Thomas Singmaster 35 or 40 years, and had lived in the neighborhood of the Singmaster home, testified that he had a conversation with Thomas Singmaster. The date of the conversation is not given, but it is apparent that it occurred some time prior to his marriage with the present Mrs. Singmaster. This witness says:

"I told Thomas it would be better if he was married, and then he would have somebody in the house to look after him. He asked me if I had heard that Mary Rowe (plaintiff's mother) was blaming him, and I told him I had. He said he hated it, but he didn't deny it; he hated it, and wished it had not happened; that he would not hate it so much if it was not for his father and his mother."

Another witness testified that, in the Singmaster home, she had a conversation with Thomas's brother, Charlie. The plaintiff was a little girl at the time, and was present. Thomas was in an adjoining room, but a short distance away. The conversation was carried on in tones loud enough for Thomas to hear. She said to Charlie, "Don't you think the little girl looks like her father, Thomas?" and Charlie said he thought she did, and Thomas made no response. The plaintiff was then a little girl, and the conversation occurred before Thomas was married.

It appears that Mary Rowe, plaintiff's mother, frequently came to the home of Samuel Singmaster in company with the little girl, remained there for several hours, ate dinner with the family; and at no time does it appear that any of the members of the family objected to her visits. It is true that the record discloses that, later,—the time does not definitely appear,—Thomas sought to avoid her on these visits. It is not a violent assumption to say that this was after Thomas had formed a purpose not to abide by his promise to marry plaintiff's mother, if such declared purpose was ever honestly formed in his mind. It is true that many witnesses testified for the defendant that, covering many years following the birth of plaintiff, as late as 1915, they joked Thomas about his relationship with Mary Rowe, and that he denied that plaintiff was his child; and some say that he denied that he had any illicit relationship with Mary Rowe.

There is testimony by the defendants tending to neg-

ative the matters herein set out. Much of it is without any persuasive probative force. It could well be true, and the matters herein set out be also true. The affirmative matters, the facts which we have set out as transpiring, are practically uncontroverted, and find confirmation in a careful reading of the whole record. Some facts stand out prominently in this case, and are very persuasive. Among all the friends and acquaintances of Thomas, and in his own immediate family, he was generally reputed to be the plaintiff's father. The plaintiff bears a strong resemblance to a member of his family. In the spring

2. EVIDENCE: admissions: settlement of bastardy proceedings.

following the birth of this child, Mary Rowe commenced bastardy proceedings against Thomas. These proceedings were settled, upon Thomas's paying to the mother $1,000. It is true that, in a receipt given by Mary, it is said that the payment should not be taken or construed as an admission by Thomas that he was father of the child. Mary Rowe was then in straightened circumstances. This reservation in the receipt does not take away the probative force of the admission involved in the settlement. Though the receipt itself does not, in and of itself, confess the fatherhood, the fact of settlement and the payment make their own proof. The reservation in the receipt is not very persuasive as a denial of parentage. The whole transaction must be considered together, in the light of all the facts and circumstances disclosed and known to the parties at the time, and must be given such weight as it is justly entitled to.

That the plaintiff is Thomas's child, the record submitted furnishes plenary proof. Through him she came into the world, under the handicap of illegitimacy—in the eyes of the world, the bastard offspring of illicit intercourse. Though innocent herself, she rests under the handicap of her mother's sin, forced through life to bear the burden of her mother's shame; while her father, in the eyes of the world,

is unaffected by the sin to which he was a party. This child
is here demanding recognition by this court as the offspring
of the man who wronged her mother. The world forgives
the sin of the man; while the woman's sin forever follows
and shames her, and the child suffers in this shame, though
without sin. The father, casting aside the woman whom he
has wronged and shamed, marries, and raises to himself a
family on whom rests no stain or shame, children with all
the advantages of honorable birth. With these, the plain-
tiff is contending for standing room in the circle of her fa-
ther's offspring. We say she is the offspring of Thomas.
The law says:

"Though this is true, you cannot divide his paternity
with his legitimate offspring, unless, forsooth, he has deigned
to recognize you as the offspring of his illicit love; and more
than that, you cannot share unless this recognition on the
part of your father was general and notorious."

So the burden rests upon this unfortunate child, driven
out though she is in character and life, by the sins of those
for whose sins she is in no way responsible, to meet the re-
quirements of the law.

It may be said that none of the facts relied upon, stand-
ing alone, in and of itself shows such recognition as the
statute requires. It may be that the record discloses, at
some time, a studied effort on the part of Thomas to avoid
a public recognition. The plaintiff, with her mother, for 26
years lived in the same neighborhood in which Thomas re-
sided. Some time after plaintiff's birth, Thomas pledged
himself to another woman; subsequently bound himself to
her by the solemn vows of marriage. Through her, he
brought children into the world. Many of the witnesses
who testified to denials on the part of Thomas are not clear
as to the date when these denials were made. Much of the
testimony rests in the uncertain memory of men who had
no occasion to remember distinctly the time when or the

circumstances under which these denials were made. There is positive and direct proof of recognition when the child was small, during the first four years of its life. It appears that the now widow, who lived in the Singmaster home, and who did not marry Thomas until 11 years after plaintiff's birth, challenged his fatherhood of this child, when he sought her hand in marriage. To procure her consent, he denied the paternity of the child. Later, she sought to have him make a will; and the record shows that the thought in her mind then was that this child might claim something of his estate, and that the safer and more prudent and businesslike method to dispose of her and her rights was to make a will. He was approached, and a will was suggested to him as the proper method of avoiding any responsibility to this child for the wrongs which he had done her mother. He knew the fact that he was generally reputed to be the plaintiff's father. He knew that his neighbors and friends generally considered him her father, and we have no doubt that he knew that this was generally understood in his own immediate family; and yet he made no will. There were some random statements that he denied his fatherhood during the earlier years of the child's life. The denials were made under such circumstances as brought no conviction to the minds of his hearers that he was not what he was generally reputed to be. During the early years of this plaintiff's childhood, when he had no motive apparently to conceal, and while still entertaining his purpose to marry, and while still lamenting the opposition of his mother to the marriage, he was seen publicly to visit the plaintiff and her mother. He was seen publicly to give them money. He was seen frequently in the company of plaintiff's mother; was seen sitting in close conference with her. Though the conversation is not given, it is not straining credulity to say that the one subject of common interest between them, the one subject that evidently dominated the

mind of plaintiff's·mother, was the subject of such confer-
ence: to wit, the legitimatizing of the child, and the re-
demption of the mother from the shame into which she had
fallen.   It appears that, at one time, in the presence of the
family, in the presence of his grandmother and his mother,
he told his mother that he had promised to marry Mary,
and that he intended to do so.   This was after the child
was born.   It appears that, while at the home of Mrs. Diggs,
shortly after the birth of plaintiff, Thomas came to Mrs.
Diggs and asked her how his girl was; and Mrs.. Diggs re-
plied, "All right."   He thereupon gave Mrs. Diggs $5.00, ana
told her not to let them suffer.   Mrs. Diggs is dead.   This
testimony was given by her daughter, who was visiting with
her.   She said he rode up outside the fence in front of the
house, conversed with Mrs. Diggs, gave her the money, and
made the remark above set out.

Twenty-seven years intervened between the birth of this
child and the giving of the testimony found in this record.
Many incidents are set out in the testimony which we can-
not here reproduce.   Many things, trivial in themselves
when disassociated from their immediate environment, tell
us nothing; but, considered in the light of the attendant
facts and circumstances apparently trivial, tell us much.
We are not bound to take the testimony of any witness
as true, and we do not do so.   That which is true is always
consistent with its natural environment.   Recognition is
a mental process.   The condition of the mind is made mani-
fest 'by overt acts or speech.   The condition of the mind
sometimes finds general recognition, even though effort be
made to conceal.   A recognition fully and fairly made, leav-
ing a lasting impression on the minds of those with whom
the putative father comes in contact in his daily and social
life, remains as a permanent recognition.   It need not have
been universal, or so general and public as to have been
known by all.   If his conduct among his neighbors and as-

sociates and friends be such that it reveals a purpose to make known, rather than to conceal the true relationship he bears to the child, it is sufficient, though there be no spoken word. General recognition, once clearly shown to have been made, establishes the fact upon which, under the statute, the right of the illegitimate child rests, though later there may appear a studied effort to repudiate such relationship. The later conduct must be viewed in the light of the changed conditions. A general and notorious recognition does not necessarily mean a continuous recognition, covering the whole period up to and including the time of the death of the putative father. A recognition, clearly shown to have been once deliberately and publicly made, made under circumstances that reveal no apparent motive to conceal, meets the requirements of the statute. The cited cases do not hold to a contrary rule, though such is claimed for them. Where the conduct is open and notorious, and can be accounted for upon no rational hypothesis except a desire to meet and assume the responsibility which legitimately follows the act charged against the putative father, it amounts to a recognition of the obligation, and the recognition of the relationship out of which the obligation arises. Assuming that Thomas is the father of this plaintiff, a natural obligation rested on him to make provision for her, that she suffer not from the contempt of a cold and unjust world. Conduct which can be accounted for only upon the theory of a recognition of this obligation, tends strongly to show a recognition of the obligation, and, when general and notorious, meets the requirements of the statute, and makes the moral obligation a legal one.

The statute upon which plaintiff's right rests is plain and unambiguous. What she is required to show, to entitle her to share in the estate of her putative father, must be found in this statute. Each case must be determined on its own peculiar facts. None but general rules can be laid

down, to guide us in the solution of a question of this kind.
That it was held in other cases submitted to this court that
the evidence was insufficient to justify a holding in favor of
the illegitimate, is of very little aid to us in the solution
of this case.   The facts in most of the cases are so essen-
tially dissimilar to the facts here before us that, in solving
the fact question here presented, very little aid can be
gathered from them.   It has been held in many cases, no-
tably *Watson v. Richardson,* 110 Iowa 673,
and *Murphy v. Murphy,* 146 Iowa 255, that
mere rumors or common reports in a neigh-
borhood to the effect that the child be-
longed to the person charged, are inadmissible to show
the paternity of the child, when he seeks to establish
heirship under the section hereinbefore set out.   But no-
where has it been held that general repute,—that it was gen-
erally believed in the neighborhood, among his neighbors and
friends, and in his family circle, that the person charged was
the father of the child,—was not competent.   In fact, it has
been recognized as competent testimony, and as having pro-
bative force upon the issue.   In *Robertson v. Campbell,* 168
Iowa 47, 55, it was said:

3. BASTARDS:
   paternity:
   evidence:
   general
   repute.

"It was also shown by many witnesses that, throughout
the Timber Creek neighborhood, the appellant was generally
reputed to be the child of Campbell. * * * We recognize that
testimony of this kind cannot be determinative of the ques-
tion * * * but it is competent evidence as bearing upon the
question of paternity, when supplemented by substantive
facts tending to show that such reputed relation actually
existed (citing authorities)."

As supporting our conclusions in this case,—though no
case is exactly like another,—see *Blair v. Howell,* 68 Iowa
619; *Van Horn v. Van Horn,* 107 Iowa 247; *Alston v. Alston,*
114 Iowa 29, 30; *Robertson v. Campbell,* 168 Iowa 47; *Luce
v. Tompkins,* 177 Iowa 168.

Upon the whole record, we reach the conclusion that the judgment of the district court was right, and it is—*Affirmed.*

PRESTON, C. J., WEAVER and STEVENS, JJ., concur.