IN RE ESTATE OF ELVY W. WULF.

E. A. NORELIUS, guardian of WESLEY EUGENE PETERSON, a minor, appellee, v. LOUIE H. WULF, administrator of estate and individually, appellant.

No. 47821.

(Reported in 48 N.W.2d 890)

July 10, 1951.

Rehearing Denied September 21, 1951.

Leighton Wederath, of Carroll, and Page & Nash, of Denison, for appellant.

E. A. Raun and R. E. Franck, both of Denison, for appellee.

Smith, J.—Elvy W. Wulf (fifty-eight and single) died intestate September 8, 1948. Louie H. Wulf, his brother and apparent sole heir, was promptly appointed administrator of his estate. On November 8, 1948, the present proceeding was started by the guardian of Wesley Eugene Peterson (then fourteen) on behalf of his ward.

The application asks that the ward be adjudged the illegitimate son and sole heir of decedent and that the administrator be removed and a new one appointed. It alleges the ward to be the

son of one Gladys Riley, formerly Gladys Peterson, that he was born July 3, 1934, and had been orally recognized by decedent as his son, said recognition being general and notorious.

Issue was joined on the allegations of the application. The case was tried, judgment rendered for plaintiff, and defendant appeals. An affirmative defense based on an alleged compromise agreement and adjudication was also pleaded but it has been disposed of in prior proceedings. See In re Estate of Wulf, 240 Iowa 1022, 38 N.W.2d 577. The sole remaining issues are therefore those of paternity and recognition under section 636.46, Iowa Code 1950, I.C.A., which so far as pertinent here provides:

"They [illegitimates] shall inherit from the father when * * * they have been recognized by him as his children; but such recognition must have been general and notorious, or else in writing."

I. A preliminary question concerns the (claimed erroneous) admission of the testimony of a large number of witnesses who testified to the effect that it was "common talk or general report" in the neighborhood that Elvy W. Wulf was the father of Wesley Eugene Peterson, claimant's ward.

Approximately forty witnesses so testified in substance. Appellant argues this testimony was only "neighborhood gossip", inadmissible to show paternity and distinguishable from evidence as to "general repute" that decedent was such father.

The argument is sought to be fortified by citation of Watson v. Richardson, 110 Iowa 673, 690, 80 N.W. 407, and Trier v. Singmaster, 184 Iowa 307, 309, 167 N.W. 538. The language of the opinion in the Watson case does tend to support the contention: "The evidence of rumors or current reports in the community where the deceased lived at or about the time claimant was born, that he belonged to Watson, or, subsequently that he had such a boy, must be excluded." (110 Iowa at page 690.)

That decision was in 1899. Fifteen years later however, in Robertson v. Campbell, 168 Iowa 47, 55, 56, 147 N.W. 301, 304, we said:

"It was also shown by many witnesses that * * * the appellant was generally reputed to be the child of Campbell * * *. We rec-

ognize that testimony of this kind cannot be determinative of the question, for busy. tongues often create undeserved reputations; *but it is competent evidence as bearing upon the question of paternity, when supplemented by substantive facts tending to show that such reputed relation actually existed.*" (Italics supplied.) Citing Hays v. Claypool, 164 Iowa 297, 145 N.W. 874; Tout v. Woodin, 157 Iowa 518, 137 N.W. 1001; Alston v. Alston, 114 Iowa 29, 86 N.W. 55; Van Horn v. Van Horn, 107 Iowa 247, 77 N.W. 846, 45 L. R. A. 93.

The Trier v. Singmaster case, supra, says (page 319):

"But nowhere has it been held that general repute—that it was generally believed in the neighborhood, among his neighbors and friends, and in his family circle, that the person charged was the father of the child—was not competent. In fact, it has been recognized as competent testimony, and as having probative force upon the issue."

In Hays v. Claypool, supra, it is also said:

"Enough is developed, perhaps, to justify the conclusion that among the friends and acquaintances of the family Samuel L. Claypool was quite generally reputed to be the plaintiff's father. That this sort of indirect or hearsay evidence is admissible upon an issue of this nature is quite well-established." (164 Iowa at page 299.)

It is true in that case plaintiff's claim was rejected by both the trial and appellate courts: "But it is nowhere held that mere repute alone is sufficient to establish the ultimate fact of parentage, and, aside from this testimony, plaintiff presents very little competent proof of the truth of his claim." ·

We are discussing now the *admissibility*, not the *sufficiency*, of such testimony. It must be concluded the testimony. was competent. We are unable to make the distinction between it and evidence of "general repute" which defendant contends for. See In re Estate of Conner, 240 Iowa 479, 485, 36 N.W.2d 833, and cases therein cited.

II. Some of appellant's argument seems to assume the case is triable here de novo. That of course is not the fact. The

proceeding was in probate, was tried as an ordinary action, and the findings of the trial court are conclusive in so far as supported by substantial evidence. In re Estate of Wise, 206 Iowa 939, 221 N.W. 567. See also In re Estate of Conner, supra (240 Iowa at pages 487, 492).

Appellant argues that in order to determine whether the proof was "clear and convincing" we must pass on the *weight* of the evidence and not merely on whether there was *some* evidence to support the trial court's finding.

We are not prepared to assume this prerogative. The burden of proof here is the same as in any law action. We have only to determine whether the evidence is substantial—more than a mere scintilla. Appellant cites two paternity cases in which the opinions say the proof of parentage must be clear and convincing, or words to that effect: McNeill v. McNeill, 166 Iowa 680, 148 N.W. 643, and Pike v. Standage, 187 Iowa 1152, 175 N.W. 12. Both were partition suits—equitable proceedings—triable de novo on appeal. That is not the situation here and we do not think the cited and similar cases are applicable.

In an early case (1882) this court pointed out that the rule by which in certain cases a chancellor governs his own action by requiring the proof to be clear and satisfactory does not apply in law actions. McAnnulty v. Seick, 59 Iowa 586, 590, 13 N.W. 743. Repeatedly since then, this distinction or limitation has been stated. See In re Estate of Dolmage, 204 Iowa 231, 235, 213 N.W. 380, in which numerous cases are cited and discussed.

The instant case was triable by ordinary proceedings. It presents an issue in the nature of, though not technically constituting, a claim against the estate on the hearing of which "all provisions of law applicable to an ordinary action shall apply." Section 635.59, Code 1950, I.C.A. And our rule in Iowa is that all proceedings in probate are triable as ordinary actions unless there is some special statutory provision to the contrary. Brem v. Swander, 153 Iowa 669, 676, 132 N.W. 829. See sections 611.3, 611.4 and 611.5, Iowa Code 1950, I.C.A.

III. Was there substantial evidence to support the trial court's decision both as to paternity and recognition under the statute? We think there was. Undoubtedly the testimony of Gladys Riley, nee Peterson, was of itself sufficient to create an

issue of fact on the issue of paternity. In 1933 she worked in the family of Elvy Wulf's parents with whom he lived. He was then approximately forty-three and she seventeen years of age. Her testimony that he entered her room at night several times is not incredible in its essential details.

There is a notable absence of any claim, or of any evidence tending to prove, that any other man was, or could reasonably be argued to have been, responsible for her pregnancy when she left the Wulf home.

But there is not lacking corroboration if corroboration were required. Edward and Lloyd Peterson testified that the day Wesley was born they heard Elvy (decedent) say he would not try to deny he was the child's father. The conversation was in the Peterson yard outside the house. Gladys (the child's mother) was in a downstairs bedroom at the time. Lloyd testified Elvy was going in to see Gladys but she "didn't want him in there" so he sat outside the bedroom door and held the baby in his arms and said "he was willing to marry Gladys and adopt the baby."

Mrs. Konrady, Gladys' older sister, testified to conversations with Elvy after it was discovered Gladys was pregnant in which he expressed sorrow and wanted to marry Gladys. Another sister, Elsie, saw Elvy hold the baby a few days after it was born and heard him say "if Gladys didn't want the baby he would take him."

True, these witnesses were Gladys' brothers and sisters, some of whom were quite young at the time they testify about. But it was a dramatic moment in their lives, calculated to make an ineradicable impression on young memories. They were not disqualified as witnesses nor was their testimony either inadmissible or incredible. It dovetails significantly with other testimony as to Elvy's own statements and conduct referred to later herein.

■ IV. There remains the question of the sufficiency of the evidence of "general and notorious" recognition by decedent in his lifetime. Again we must sustain the decision of the trial court.

We have already mentioned the testimony of an impressive number of witnesses to "general repute" or "common talk" in the neighborhood, as being admissible on the question of paternity. Such evidence has a bearing also on the subject of "recognition",

in so far at least as the rumors can be related to the words and conduct (and the silence even, under significant circumstances) of the putative father. See Tout v. Woodin, supra, 157 Iowa at page 522.

We of course cannot discuss minutely the approximately two hundred pages of record devoted to the testimony of some eighty witnesses, practically all having some relation to the question of Elvy Wulf's attitude toward the charges and rumors concerning his alleged paternal relationship to Wesley.

One witness testified: "I asked him right to his face * * * just how it came about and he told me just how it happened. * * * I told him that was rape and he said he guessed it was." The witness was Gladys' uncle, but describes himself as Elvy's friend.

Ed Darling, who said he knew Elvy "ever since he was big enough to see" and who says they "went to grade school together" and that "he was one of my better friends," told of a conversation with Elvy some time after the child was born: "I said 'Hello, Daddy' just like that; and he says, 'Yes, you would have to bring that up, wouldn't you?' And I said, 'It's true ain't it?' And he says, 'Yes, it is.'"

Another witness testified Elvy told him, "I went down and made a settlement for the boy." Another (very reluctant) witness gave about the same testimony and said Elvy told him "he offered to marry her" and that he "held the child in his arms," and "had been there more than once."

Mrs. Turner, who worked in the Wulf home for about five years, testified Elvy told her he had offered to marry Gladys and "did not marry her because Petersons objected." This witness says Elvy told her once "he had paid his debt, and it was all over but that it wasn't a necessary debt"; also that on another occasion he said that someone "said the boy looks like me but I don't know"; also "he said they wouldn't let him come there or something like that." She says these conversations were in the presence of Elvy's mother, who told her "that the settlement was made at her [the mother's] request to keep down gossip in the neighborhood" and "to hush up the scandal."

Another witness, Emmor Foster, who said he "kidded" him in regard to the matter, testified Elvy would "just grin—that's

about all." Another witness related a conversation in which Elvy said: "No, I haven't got an old lady. * * * I should have had if it hadn't been for that damned Charlie Peterson. * * * I wanted to marry that girl * * * that child was mine."

Mrs. Landgraf, who worked as housekeeper for Elvy Wulf several years and up to the time he died, said Elvy told her he had a son named Wesley and that "Gladys Peterson was the mother." She says "He would get to talking about it every now and then," ("seven or eight times") and that he once pointed Gladys out to her. She also testified Elvy said: "If everything had went all right and went his way he could have had some help too by this time."

Bud Riley, Gladys' brother-in-law, related a conversation with Elvy Wulf in which Elvy asked about Wesley and said, "You know that was my boy." It was in the store and the witness says James Bral was present. Bral testified that Elvy asked about the boy and said, "I sure miss him."

On the other hand, the defense produced numerous witnesses (possibly as many as were produced by claimant) who testified they never heard the rumors and reports, never heard Elvy make any declaration or admission, never heard any discussion in the Wulf family circle. Nick Wulf testified Elvy said he was blamed because "she was there" (at the Wulf home). This witness, on cross-examination, admitted: "I have heard it said in my family and the Wulf family that Elvy was in trouble with the hired girl." Mrs. Louie Wulf said all she ever heard in the family talk was that "Elvy said that he was supposed to make a settlement to hush gossip."

Only two witnesses said they ever heard Elvy deny he was Wesley's father and one of these was defendant, Louie Wulf, himself. The other merely testified Elvy said "He wasn't the fault of it"; also: "They tried to blame it on me but * * * I had no connection with it at all." One witness related that Elvy's father, Henry Wulf, said Charley Peterson sent his daughter to the Wulf home to work in order to get Elvy into trouble so he (Peterson) could get his notes back—certainly an implausible theory and immaterial even if true. The innocent offspring's rights under our statute could not be prejudiced by proof of any machinations of that sort.

1020

There are the usual—but probably not more than the usual—contradictions between witnesses. There is the usual argument as to the improbability of testimony and the bias of witnesses. But all these matters were for the court to consider and weigh in determining whether there had been "general and notorious" recognition of claimant's ward as decedent's son.

We realize appellant had the difficult task of meeting affirmative testimony by proof of a negative. It is hard to disprove what some persons testify *was* said or done on *certain* occasions, by testimony of others that it *was not* said or done at *other* times and places. That is a difficulty that inheres in the issue of "recognition" under the statute—a difficulty the putative father, having once legally settled for a child's support, could easily avoid by making a will. Lepper v. Knox, 179 Iowa 419, 161 N.W. 454, L. R. A. 1918A 43; Norris v. Loyd, 183 Iowa 1056, 1060, 168 N.W. 557. The trier of fact takes all this into consideration.

There is ample indication in the record here that Elvy was not unaware of what people were thinking and saying. And his conduct in this situation may properly be construed as general recognition. Alston v. Alston, supra, 114 Iowa at page 39.

V. The words "general and notorious" invite controversy and are difficult of definition and application. In In re Estate of Clark, 228 Iowa 75, 111, 290 N.W. 13, 30, it is said:

"Recognition may be by acts and conduct as well as by words. * * * the extent and nature of the recognition depends upon the circumstances and conditions, and these must be considered in determining whether the requirement of the law is met."

It is generally held the recognition need not be "universal, or so general and public as to have been known by all"; need not be continuous, "covering the whole period up to and including the time of the death of the putative father." Trier v. Singmaster, supra, 184 Iowa at pages 317, 318; Luce v. Tompkins, 177 Iowa 168, 178, 158 N.W. 535. See also Tout v. Woodin, supra, 157 Iowa 518, 522, 137 N.W. 1001, and In re Estate of Wise, supra, 206 Iowa 939, 941, 221 N.W. 567. It may be established, notwithstanding occasional denials by the putative father. Luce v. Tompkins, supra.

We think there was substantial evidence here to support the trial court's finding that the recognition of Wesley by Elvy as his son was "general and notorious." Testimony of Elvy's conduct and statements when the baby was born and on other occasions precludes any holding by us to the contrary.

We find no error to justify appellate interference and the decision of the trial court is affirmed.—Affirmed.

All Justices concur.