**IN THE COURT OF APPEALS OF IOWA**

No. 23-0167
Filed January 10, 2024

**IN THE MATTER OF THE ESTATE OF ROSS C. RIVER, Deceased.**

**JAY R. CLAEYS,**
        Plaintiff-Appellant,

**vs.**

**BRUCE R. RIVER, Individually and as Executor of THE ESTATE OF ROSS C. RIVER,**
        Defendant-Appellee.
_____

        Appeal from the Iowa District Court for Jackson County, Mark R. Lawson,

Judge.

        A plaintiff appeals from the district court's grant of summary judgment

dismissing his challenge to a will for lack of standing. **AFFIRMED.**

        Peter C. Riley of Tom Riley Law Firm, P.L.C., Cedar Rapids, for appellant.

        Susan M. Hess of Hammer Law Firm, PLC, Dubuque, for appellee.

        Considered by Bower, C.J., and Buller and Langholz, JJ.

**LANGHOLZ, Judge.**

Jay Claeys claims to be the biological son of Ross River. After River died with a will that left nothing to Claeys and a codicil that disinherits him by name, Claeys brought this challenge to the will. He contends that River lacked testamentary capacity and was unduly influenced by River's family to exclude Claeys from the will. But Claeys has a hurdle right out of the gate: to challenge the will, he must have some interest in the estate, like being the heir he claims to be. *See* Iowa Code § 633.308 (2021). And to show that he is an heir, Claeys must prove both River's paternity and that River recognized him as a son either in writing or generally and notoriously. *See* Iowa Code § 633.222.

The district court granted summary judgment against Claeys because he failed to create a genuine issue of material fact that River had recognized Claeys as his son generally and notoriously or in writing. Claeys appeals, mainly contending that the evidence of recognition that he presented should have been enough to create a factual dispute that survives summary judgment. But Claeys's scarce evidence that River told a handful of people that Claeys was his son over forty years and sometimes gave Claeys gifts does not rise to general and notorious recognition. We thus affirm the district court.

I.

Ross River died in 2021. His detailed thirty-some-page will makes no mention of Jay Claeys. It leaves nothing to Claeys. And it does not name him as one of River's four children. A couple of years before he died, River also executed a codicil specifically disinheriting Claeys by adding one paragraph to the will:

I have intentionally made no provision herein for Jay Ross Claeys, or for his descendants, if any, whether or not they be living now or at my death, and for all purposes this instrument shall be construed as though Jay Ross Claeys predeceased me without descendants living.

Claeys eventually filed this will contest in August 2021, alleging that River lacked capacity to execute the will and was unduly influenced by River's wife and one of his sons, Bruce—who is the executor of River's estate. Claeys also alleged that he is one of River's sons and thus should inherit from the estate under the laws of intestacy since the will is invalid. And Claeys brought a claim of tortious inference with inheritance against River's son, Bruce.

Over the next year—helped by court intervention—River's estate and Bruce River (collectively, "the Estate") engaged in discovery on Claeys's claims. Claeys did not. Then, in July 2022, the Estate moved for summary judgment arguing that Claeys's will-contest claims failed as a matter of law because undisputed facts showed he was not an heir and lacked standing to challenge the will—because he was not River's biological son and River had not recognized him as such generally and notoriously. The Estate also argued that Claeys's challenge based on undue influence and lack of testamentary capacity failed on the merits. And it sought to dismiss the tortious-interference-with-inheritance claim.

After receiving some extra time to do so, Claeys resisted the summary judgment motion. He submitted evidence—mainly the deposition testimony of himself and his mother—that he argued creates a factual dispute that should proceed to trial. Claeys did not move to postpone consideration of the motion so that he could conduct additional discovery. *See* Iowa R. Civ. P. 1.981(6).

The summary judgment record developed by the parties, viewed in the light most favorable to Claeys, shows the following relevant facts. According to Claeys's mother, she was approached by Ross River about conceiving a child around 1977 because he was devastated about the death of his daughter. She eventually agreed and conceived a child with River. She was married and had two other children at the time. But her husband—whom she told about the arrangement with River—underwent a vasectomy six years earlier. So she is confident he could not have been Claeys's father.

Claeys was then born in 1978. His birth certificate lists his mother and her husband as his parents—not River. But Claeys's mother testified that River came to the hospital at some point around Claeys's birth and he would visit the family at their home when Claeys was growing up. Claeys also recalls that River often visited on his birthday and Christmas or Thanksgiving, typically bringing fried chicken from a fast-food restaurant for the family. Claeys or his mother testified that River gave Claeys a candle on his first birthday and would sometimes give him birthday cards. And River sometimes brought a feed sack with gifts for the family, such as old clothes or canned goods.

Both Claeys and his mother agreed that he did not learn that River was his father until he was nineteen years old and his maternal grandfather—who was a good friend of River's—told him the news. His mother said that she kept it from him because she feared it would "mess with his mind." According to Claeys, he then spoke with River, who admitted to being Claeys's father and apologized emotionally. Over the next two decades, Claeys and River would periodically discuss getting a paternity test. But they never did; River would typically be

noncommittal or say he would work on making arrangements without ever following through.

Claeys described his relationship with River as basically a business one. While still a child, Claeys and his brother would sometimes do odd farm jobs for River—typically two or three times in a given summer. In high school, he started working for River doing welding. And after graduating, Claeys worked for River at one of his businesses full-time for about four years.

River and his family were active members of the community in Maquoketa and surrounding area in northeast Iowa. There, he resided, owned and ran multiple businesses, and owned and farmed land. They interacted regularly with members of the community. River's son, Bruce, swore in an affidavit that he had never heard a claim from anyone that Claeys was River's biological son until after River died. Indeed, Bruce was not even acquainted with Claeys until then.

But according to Claeys, another son of River's, David, did interact with Claeys and would sometimes call Claeys "Bro." And a mutual friend and coworker of David and Claeys testified that David may have also told him that River was Claeys's father. Claeys and his mother also spoke with River's wife, and they said that she knew Claeys was River's son. Claeys also believed from his conversations with River's wife that she told her boys—Bruce and David—the same.

Claeys identified no one else who ever discussed River being his father. And none of the potential witnesses identified by Claeys in his discovery responses testified that they ever heard River refer to Claeys as his son.

The district court granted summary judgment and dismissed all of Claeys's claims. While the court held that Claeys generated a factual dispute on the paternity issue, it decided he did not do so on the issue of River's general and notorious recognition. The court thus reasoned that Claeys's will-contest claims failed since no reasonable factfinder could find that he was an heir. The court also independently held that the tortious-inference-with-inheritance claim failed because Claeys did not come forward with any evidence creating a factual dispute that he had a reasonable expectation of receiving an inheritance or that River's son, Bruce, had committed an intentional and independent legal wrong. *See Buboltz v. Birusingh*, 962 N.W.2d 747, 753 (Iowa 2021). After unsuccessfully seeking reconsideration from the district court, Claeys now appeals the dismissal of his will-contest claims.[1]

II.

We review a grant of summary judgment for correction of errors at law. *Peak v. Adams*, 799 N.W.2d 535, 542 (Iowa 2011). Under Iowa Rule of Civil Procedure 1.981, the district court must grant a motion for summary judgment "if

---

[1] Claeys references his "bequest interference" claim along with the will-contest claim in the single issue he included in his statement of the issues presented for review, *see* Iowa R. App. P. 6.903(2)(c), and again in the heading of his argument section. But he makes no argument of error directed at the district court's ruling on that claim. And the ruling is based on entirely different issues of undisputed material fact than the will-contest claim. To the extent that he intended to appeal the dismissal of that second claim, Claeys has waived it. *See* Iowa R. App. P. 6.903(2)(g)(3) (requiring "argument containing the appellant's contentions and the reasons for them with citations to the authorities relied on and references to the pertinent parts of the record" and providing that "[f]ailure to cite authority in support of an issue may be deemed waiver of that issue"); *Soo Line R.R. Co. v. Iowa Dep't. of Transp.*, 521 N.W.2d 685, 691 (Iowa 1994) (holding that "random mention" of issue in brief "without elaboration or supportive authority, is insufficient to raise the issue" for appellate review).

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," submitted in support or resistance of the motion "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3). In resisting summary judgment, the nonmoving "party may not rest upon the mere allegations or denials in the pleadings, but the response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Iowa R. Civ. P. 1.981(5).

"Summary judgment is not a dress rehearsal or practice run for trial but rather the put up or shut up moment in a lawsuit, when a nonmoving party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Buboltz*, 962 N.W.2d at 754–55 (cleaned up). And if, after considering all that evidence in the light most favorable to the nonmoving party, no reasonable mind could differ on how the factual issues should be resolved—and the law applied to those facts compels judgment for the moving party—summary judgment must be granted. *See id.* at 754.

While the Estate argued that Claeys failed to create a fact dispute on a host of material issues for his will-contest claim, the district court granted summary judgment based on a single fatal defect: Claeys put forth no evidence from which a reasonable factfinder could conclude that River had recognized Claeys as his son generally and notoriously or in writing. And so, Claeys cannot show he is an heir under Iowa Code section 633.222, and he lacks standing to challenge the will. *See* Iowa Code § 633.308 (authorizing "[a]ny interested person" to "petition to set aside the probate of a will"); *In re Est. of Kenny*, 10 N.W.2d 73, 75 (Iowa 1943)

(applying common law—before the enactment of section 633.308—and explaining that being an "heir at law" satisfied a will contestant's obligation to show "an interest in the estate"); *see also In re Est. of Pearson*, 319 N.W.2d 248, 249–50 (Iowa 1982) (looking to both section 633.308 and prior common law precedent in deciding standing to contest a will).

We thus start with the statute governing whether Claeys is an heir of River. Under Iowa Code section 633.222,

> Unless the child has been adopted, a biological child inherits from the child's biological father if the evidence proving paternity is available during the father's lifetime, or if the child has been recognized by the father as his child; but the recognition must have been general and notorious, or in writing.

Iowa Code § 633.222. All agree that Claeys was not adopted by River, did not prove River's paternity during River's lifetime, and has no evidence that River recognized him as a son in writing. And the district court ruled—without any challenge now on appeal—that there is a factual dispute on paternity. But Claeys must prove both paternity and recognition to qualify as an heir. *See In re Est. of Evjen*, 448 N.W.2d 23, 24 (Iowa 1989). Thus, we must decide if there is a factual dispute over whether River "recognized" Claeys "as his child" with recognition that was "general and notorious."[2] Iowa Code § 633.222.

General and notorious recognition has been the statutory standard for deciding heirship in Iowa for over 170 years. *See* Iowa Code § 1416 (1851)

---

[2] The Estate argues that we should not decide this issue because Claeys failed to preserve error due to the repetitive nature of Claeys's motion under rule 1.904 in the district court. But Claeys resisted the Estate's summary judgment motion with essentially the same arguments he now makes on appeal, and the district court rejected them in its ruling. Claeys properly preserved error. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002).

("[Illegitimate children] also inherit from the father whenever they have been recognized by him as his children, but such recognition must have been general and notorious or else in writing."). Since early on, our supreme court has looked to the dictionary definitions of "general" and "notorious" to interpret the statute. *See Watson v. Richardson*, 80 N.W. 407, 414 (Iowa 1899). "General" means "common to many, or the greatest number; widely spread; prevalent; extensive, though not universal." *Id.* (citation omitted). While "notorious" means "generally known and talked of by the public; universally believed to be true; manifest to the world." *Id.* (citation omitted). Together, these words "emphasiz[e] the thought that the understanding of the father's recognition should be as extensive as the immediate community of his residence, and within the common knowledge of the public." *Id.*

The minimal evidence that Claeys submitted in resistance to summary judgment was enough to create a factual dispute over whether River recognized Claeys as his son. But no reasonable factfinder could conclude that the recognition was general and notorious as required by section 633.222. So the district court properly granted summary judgment.

Only Claeys and his mother directly testified that they heard River acknowledge that Claeys was his son. All others deposed—even those who had been named as possible witnesses by Claeys—said they never heard River discuss the matter. Claeys or his mother also claimed that her husband, her father, River's wife, and both of River's sons all knew that Claeys was River's son.[3] And

---

[3] Indeed, Claeys's testimony that one of River's sons would sometimes call him "Bro," viewed in the light most favorable to Claeys, also offers support that River told that son. But the evidence goes no further than that because it was the son—not River—using the term. And it thus does not show *River's* recognition.

a friend of Claeys testified that one of River's sons may have told him that River was Claeys's father. But even accepting all this as true, as we must, that would be a grand total of eight people—nearly all a part of either family—who learned of River's recognition. And it is only members of River's or Claeys's family that are alleged to have heard anything directly from River.

While we do not require River's recognition to "be proclaimed from the housetops," he must "acknowledge[] it openly whenever any reference to the subject is made," and repeat it so often, throughout "his intercourse with neighbors, associates, and friends," that it shows "his willingness that all who care to know the truth may understand that he is the father of the child." *Hays v. Claypool*, 145 N.W. 874, 875 (Iowa 1914) (cleaned up). River was alive for over forty years after Claeys was conceived. If River had been generally and notoriously recognizing Claeys throughout his interactions in the community, there would be more witnesses than Claeys and his mother able to testify; and someone outside Claeys's or River's family who would have seen or heard recognition by River. *See id.* (reasoning that it was "inconceivable" that plaintiff could have only found four witnesses to recognition if purported father had been generally and notoriously recognizing him over fifty-seven years after the plaintiff's birth); *see also Watson*, 80 N.W. at 414 (reasoning that recognition of "illegitimate child" by a "man of importance in the small town" of Maquoketa who "had a wide acquaintance" would have been memorable to acquaintances and thus absence of testimony showed lack of "any such general recognition or notoriety").

By comparison, one father who was held to generally and notoriously recognize his child was only alive and able to tell people about his recently

conceived child for *one week*. *See Evjen*, 448 N.W.2d at 25. And in that short time, he had conversations—some lengthy—with at least five people from all aspects of his life—an aunt, cousins, high school classmates of his and the mother's, and another whose connection was not noted. *See id.* at 25–26. And many cases in which general and notorious recognition has been found have done so based on dozens of witnesses. *See, e.g.*, *Tout v. Woodin*, 137 N.W. 1001, 1002 (Iowa 1912) (more than twenty witnesses testifying to father's recognition); *In re Est. of Wulf*, 48 N.W.2d 890, 891–95 (Iowa 1951) (more than forty witnesses to "common talk or general report in the neighborhood" and many others who testified about the father's direct recognition (cleaned up)).

True, recognition can be manifest through conduct as well as words. *See Trier v. Singmaster*, 167 N.W. 538, 541 (Iowa 1918). And River's conduct early on—going to the hospital around Claeys's birth, giving occasional gifts and cards, and participation with Claeys's family at his birthday and holidays—supports recognition. But this too was only private conduct within Claeys's immediate family. *See Watson*, 80 N.W. at 414 (holding no general and notorious recognition from visits and gifts and acknowledgements when—with only a couple of exceptions—it was limited to the household of the mother). There is no evidence that the conduct was so open and obvious that it "was observable by all, or nearly all, who came to the house." *Blair v. Howell*, 28 N.W. 199, 200 (Iowa 1886); *see also Trier*, 167 N.W. at 541 (holding recognition was general and notorious when father was often in the mother's company and seen giving money publicly). And even within those private walls, we know that its nature was such that it did not

lead Claeys to believe River was his father since he did not learn that until he was nineteen.

We have probed the entire summary judgment record and agree with the district court. Claeys failed to present sufficient evidence in resistance to summary judgment to create a factual dispute as to whether River generally and notoriously recognized him as a son. And so Claeys lacks standing to contest the will, and the Estate "is entitled to a judgment as a matter of law." Iowa R. Civ. Proc. 1.981(3). Therefore, we affirm the district court's grant of summary judgment.

**AFFIRMED.**